# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

|  |  |
|---|---|
| M.E. and J.E., minors, through Michael McKasy, as Litigation Guardian ad Litem; and JOSHUA EDDO, individually, | No. 53011-2-II |
| Appellants, | |
| v. | |
| CITY OF TACOMA, a political subdivision of the State of Washington, | PUBLISHED OPINION |
| Respondent. | |

LEE, C.J. — Joshua Eddo and his two daughters, M.E. and J.E. (collectively, the appellants), appeal the superior court's orders granting summary judgment and dismissing their entire complaint against the City of Tacoma (the City).  We hold that the appellants' negligence claim under RCW 26.44.050 fails as a matter of law because none of the City's actions resulted in a harmful placement decision.  We also hold that the special relationship in *H.B.H.*[1] does not extend to law enforcement, and therefore, the appellants' claim that there is a common law duty to protect based on a special relationship recognized in *H.B.H* fails.  And the appellants have failed to adequately argue a common law duty based on affirmative actions.  Accordingly, we affirm the superior court's orders granting the City's motions for summary judgment.

---

[1] *H.B.H. v. State*, 192 Wn.2d 154, 429 P.3d 484 (2018).

FACTS

A.   PLEADINGS AND MOTIONS FOR SUMMARY JUDGMENT

In 2017, the appellants filed a complaint against the City alleging the officers and detectives of the Tacoma Police Department (TPD) negligently conducted investigations in 2011, 2012, and 2013, which resulted in M.E. and J.E. remaining in an abusive home.  The complaint also alleged that the City "breached its duty when among other things, it negligently hired, trained, supervised, and monitored its personnel."  Clerk's Papers (CP) at 5.  The City answered the appellants' complaint by denying any negligence and asserting various affirmative defenses.

The appellants moved for partial summary judgment dismissal of the City's affirmative defenses and the City moved for summary judgment dismissal of the appellants' claims that TPD acted negligently.  In support of these motions, the parties presented the following evidence and arguments.

1.   2011 Investigation

In October 2011, M.E., age 5, and J.E., age 3, lived with their mother, Jocelyn Drayton, as their primary residential parent and had supervised visitation with Eddo.  After a supervised visit, Eddo contacted TPD and reported that J.E. vomited after taking some of her mother's medication.  In response to the call, TPD Officers Jennifer Corn and Bret Terwilliger were dispatched to Drayton's residence to conduct a welfare check.

Upon arriving at the residence, the officers learned that Drayton was at work and the children were being watched by Drayton's roommate, Rikki Buttelo.  Buttelo told the officers that the children were asleep in their mother's bedroom.  The officers visually checked the children for signs of injury, but they did not want to wake the children due to the late hour.

The officers asked Buttelo about J.E.'s vomiting. Buttelo informed the officers that J.E. had been sick all day and had been running a fever. When J.E. vomitted during the day and the vomit was pink, he was concerned, until he learned that she had eaten pink strawberry yogurt.

The officers observed that the floor of the master bedroom was "completely destroyed" with clothing, garbage, and debris covering the floor. CP at 44. It was impossible to walk through the master bedroom without stepping on something. And the officers observed a piece of pornography on the floor of the master bedroom. There were also medication bottles on the floor and dresser. The children's room was "slightly cleaner." CP at 44. But the kitchen sink and counters were covered in food and dirty dishes. The officers checked the refrigerator and pantry and confirmed that there was consumable food available for the children. In her report, Officer Corn stated that she did not "see a need to remove the children[,]" but noted the condition of the home was "not suitable" for children and referred the report to CPS for further investigation. CP at 44.

2.  2012 Investigation

In January 2012, TPD Detective Cynthia Brooks received a referral from CPS regarding M.E. and J.E. The referral was made by Sarah Kier, M.E. and J.E.'s visitation supervisor. Kier reported that on the way back from their visitation with Eddo, the girls told her about a "ghost" that was "peeking" at them in the bathroom. CP at 164. J.E. reported that the ghost came into the shower and punched her in the back. J.E. said that "[t]he ghost is entangled with Jason." CP at 164. Kier believed that Jason referred to Drayton's boyfriend, Jason Karlan. Kier also reported that J.E. was complaining of vaginal pain.

Detective Brooks contacted the assigned CPS investigator, Rocky Stephenson. Brooks and Stephenson arranged to have the children examined at the Child Advocacy Center (CAC) at Mary Bridge Children's Hospital three days later. They also planned to contact Drayton and the children before the scheduled exams to conduct safety interviews with both children.

Prior to the interviews, Detective Brooks contacted Kier. Kier clarified that J.E. did not report vaginal pain when talking about the ghost. Instead, Kier had noticed J.E. grabbing at her vaginal area and noticed an odor when J.E. urinated. Kier also reported J.E. was urinating frequently. Brooks also learned that the girls lived with Drayton and Karlan. Karlan provided care for the girls while Drayton was at work.

Prior to the exams scheduled at CAC, Detective Brooks and Stephenson conducted a safety interview with M.E. at her school. During the safety interview, M.E. made no disclosures of physical or sexual assault. M.E. told Brooks that Karlan had "Jedi powers" and could use them to make the car windows go up and down. CP at 254. M.E. reported that Drayton and Karlan disciplined her by sending her to the corner. M.E. did not report any concerns at home.

After conducting the safety interview with M.E., Detective Brooks and Stephenson went to the home to contact Drayton. Drayton was not home, but Karlan and J.E. were at the home. Drayton arrived at the home approximately 15 minutes later. Drayton explained the girls had a counseling appointment scheduled that afternoon, but she agreed to meet Brooks and Stephenson at the CAC for the exams.

A few hours later, Drayton met Detective Brooks and Stephenson at the CAC. Drayton told Brooks that she had discussed good touch and bad touch with the girls. Drayton also told

4

Brooks that neither girls disclosed that a ghost hit them or watched them in the shower. Drayton further stated that there was no physical discipline in the house.

Brooks and Stephenson then conducted a safety interview with J.E. J.E. reported that things are good at home and that if she gets in trouble she gets a time out. J.E. explained to Brooks and Stephenson that one day the bathroom door opened and nobody was there. J.E. said that it "freaked" her out. CP at 255. J.E. did not report any concerns at home.

M.E. and J.E. both had a medical examination performed by a registered nurse practitioner, Michelle Breland, at Mary Bridge Children's CAC. Breland conducted an interview with M.E. During the interview, M.E. did not make any disclosures of physical or sexual abuse. Breland also performed a physical examination on M.E. Breland concluded that the exam revealed "a well child" and there were no signs of acute injury or healed trauma. CP at 242.

Breland also conducted a physical examination of J.E. J.E. did not make any disclosures of abuse to Breland during the interview. J.E.'s physical exam did not have any signs of acute injury or healed trauma. However, the exam did reveal a normal variation in the hymenal opening which can cause urine to pool and would explain the urinary odor that was reported.

While the examinations were being conducted at the CAC, Detective Brooks contacted Karlan in the parking lot. As to the specific allegations, Karlan told Brooks that the girls believed he had "Jedi mind powers" because one time he made the car windows go up and down and they did not know how he did it. CP at 255. Another time he turned the lights on and off and the girls did not know it was him. Karlan told Brooks that he primarily used time outs as discipline and did not use physical discipline with the girls. He said that the girls were potty-trained and they could

5

bathe and dress themselves without his assistance. Karlan denied peeking at the girls in the shower. Karlan also denied hitting or punching either girl in back.

Based on the investigation and the fact that neither girl made any disclosures of abuse, Detective Brooks cleared the criminal investigation and referred the case back to CPS for any follow-up investigation. Detective Brooks did not run a national criminal background check on Karlan.

3.      April 2013 Investigation (J.B.'s Allegations)

In April 2013, TPD Detective Jennifer Quilio received a CPS referral regarding allegations that Karlan had sexually abused J.B., who Karlan babysat. After receiving the referral, Detective Quilio contacted Courtney Thorpe, J.B.'s mother.

Thorpe reported she had been friends with Drayton and Karlan but that she had a falling out with Drayton and had not seen them for three months. Prior to the falling out, Karlan often babysat for J.B. while he was watching M.E. and J.E. Thorpe also informed Quilio that Drayton and Karlan had moved and she did not know where they currently lived, except she believed they lived somewhere in Fircrest.

After talking to Thorpe, Detective Quilio reviewed Detective Brooks's investigation into the 2012 referral. Quilio confirmed that after safety interviews and medical examinations, neither girl had made a disclosure of physical or sexual abuse.

Detective Quilio arranged for a forensic interview and medical examination of J.B. at CAC on May 16, 2013. During the forensic interview, J.B. made very clear disclosures of multiple instances of sexual abuse by Karlan. One instance happened at Karlan's house and at least one other instance happened at J.B.'s house. During the forensic interview, J.B. did not make any

6

disclosures that M.E. or J.E. were abused. After the forensic interview, Quilio had probable cause to arrest Karlan for child rape.

After various attempts at locating Karlan, the officers arrested him in the early morning hours of August 27. CP 141; PDF 147. Karlan agreed to speak with Quilio.

Shortly after midnight on August 27, Detective Quilio spoke with Karlan. Karlan initially denied the allegations made by J.B. Then Karlan claimed he may have been drunk and not able to remember. Karlan was then booked into jail.

On August 29, Detective Quilio spoke with Drayton. Drayton informed Quilio that the safety of her children was of paramount importance and she was prepared to keep Karlan away from the girls until the case was resolved. Drayton told Quilio that she had discussed Karlan's arrest with M.E. and J.E. and the girls did not make any disclosures of abuse by Karlan. Quilio also received a message from Eddo saying that he had also discussed Karlan with the girls and the only disclosure they made was that Karlan would lay on the bed and bounce them in the air.

Detective Quilio also monitored the jail calls between Drayton and Karlan. Drayton told Karlan that she was advised to maintain her distance to protect her custody of the girls. Although Drayton claimed to stand by him, she informed Karlan that she would not visit or accept calls from him. At the end of August, Quilio had no information indicating that Karlan had inappropriate sexual contact with M.E. and J.E.

4.      M.E.'s Allegations of Abuse Against Karlan

In October 2013, Detective Quilio received a CPS referral from M.E.'s school counselor. The counselor's referral included information that M.E. had a supervised visit with Eddo the prior weekend, which was her first visit with Eddo in months. The next day, M.E. came to the school

counselor and reported that Karlan would wake her up in the middle of the night and touch her "in the wrong parts and has her do things." CP at 145. The counselor also reported that Drayton arrived at the school, told M.E. that if someone was hurting her they would get to the bottom of it, and asked if M.E.'s father helped her remember. The counselor reported that M.E. responded, "Yes, daddy said I get to see him more if I remember things." CP at 145.

Based on M.E.'s disclosure to the school counselor, Detective Quilio arranged for a forensic interview at CAC. During the forensic interview in October 2013, M.E. disclosed sexual abuse by Karlan. J.E. did not make any disclosures of sexual abuse against Karlan.

Based on the disclosures, the prosecutor charged Karlan with three counts of first degree rape of a child and three counts of first degree child molestation. All the charges were based on a charging period from August 1, 2012 to October 1, 2013.

On August 29, 2014, the State moved to dismiss the charges related to M.E. with prejudice because "based on newly discovered evidence obtained this week, a reasonable doubt has been raised as to whether or not the defendant committed the crimes charged under this cause number." CP at 324. The Pierce County Superior Court dismissed the charges.

5.      Appellants' Disclosure Evidence

The appellants' damages expert, Robert Wynne, compiled a report of disclosures M.E. made regarding Karlan's alleged sexual abuse. The report stated that M.E. claimed the abuse began when M.E. was in the first grade in fall of 2012 and ended the summer before she began second grade in 2013. The report regarding J.E. only repeated the disclosures made by M.E. and did not include any independent disclosures from J.E. that Karlan had sexually abused her.

8

B.      SUPERIOR COURT'S RULINGS ON SUMMARY JUDGMENT MOTIONS

At the hearing on the cross-motions for summary judgment, the superior court granted the City's motion for summary judgment to dismiss appellants' negligence claim based on the 2011 and 2012 investigations. The superior court deferred considering the City's motion for summary judgment on the 2013 investigation and the appellants' motion for partial summary judgment on the City's affirmative defenses.

The appellants filed a motion for reconsideration of the superior court's ruling. CP 985; PDF 347. The appellants also filed a second motion for partial summary judgment. The City also filed a second motion for summary judgment on the 2013 investigation.

The superior court denied the appellants' motion for reconsideration. But the superior court granted the City's second motion for summary judgment, dismissing appellants' negligence claim based on the 2013 investigation. Based on its rulings, the superior court dismissed the appellants' complaint against the City.

The appellants appeal the superior court's order granting the City's motions for summary judgment and the order denying appellants' motion for reconsideration.[2]

ANALYSIS

The appellants argue that the superior court erred by granting the City's summary judgment motions and dismissing their claim that the City breached its duty to M.E. and J.E. under RCW 26.44.050, the common law duty to protect based on a special relationship recognized in *H.B.H.*

---

[2] The appellants do not appeal the superior court's order denying their motion for partial summary judgment.

*v. State*, 192 Wn.2d 154, 429 P.3d 484 (2018), and the common law duty to act reasonably when undertaking an affirmative action. We disagree.

A.    SUMMARY JUDGMENT STANDARD OF REVIEW

We review summary judgment motions de novo. *M.W. v. Dep't of Social & Health Servs.*, 149 Wn.2d 589, 595, 70 P.3d 954 (2003). Summary judgment is appropriate if the pleadings, affidavits, depositions, and admissions demonstrate the absence of any genuine issue of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c). "'A material fact is one that affects the outcome of the litigation.'" *Boone v. State Dep't of Social & Health Servs.*, 200 Wn. App. 723, 732, 403 P.3d 873 (2017) (quoting *Elcon Constr., Inc. v. E. Wash. Univ.*, 174 Wn.2d 157, 164-65, 273 P.3d 965 (2012)).

When the defendant files a motion for summary judgment showing the "'absence of evidence to support the [plaintiff]'s case,'" the burden shifts to the plaintiff to set forth specific facts showing a genuine issue of material fact exists for trial. *Young v. Key Pharm., Inc.*, 112 Wn.2d 216, 225 n.1, 770 P.2d 182 (1989) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)). The nonmoving party cannot rely on "speculation, argumentative assertions that unresolved factual issues remain, or in having its affidavits considered at face value." *Seven Gables Corp. v. MGM/UA Entm't Co.*, 106 Wn.2d 1, 13, 721 P.2d 1 (1986). The nonmoving party must present more than "[u]ltimate facts" or conclusory statements to defeat summary judgment. *Grimwood v. Univ. of Puget Sound, Inc.*, 110 Wn.2d 355, 359, 753 P.2d 517 (1988), *abrogated on other grounds by Mikkelsen v. Pub. Util. Dist. No. 1 of Kittitas County*, 189 Wn.2d 516, 404 P.3d 464 (2017). If the plaintiff "'fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that

party will bear the burden of proof at trial,'" summary judgment is proper. *Young*, 112 Wn.2d at

225 (quoting *Celotex*, 477 U.S. at 322).

B.      NEGLIGENT INVESTIGATION UNDER RCW 26.44.050

It has long been recognized that RCW 26.44.050 creates a statutory cause of action for

negligent investigation against both law enforcement and the Department of Social and Health

Services (DSHS). *Tyner v. Dep't of Social & Health Servs.*, 141 Wn.2d 68, 79-81, 1 P.3d 1148

(2000). RCW 26.44.050 provides:

> Except as provided in RCW 26.44.030(11), upon the receipt of a report concerning the possible occurrence of abuse or neglect, the law enforcement agency or the department [of social and health services] must investigate and provide the protective services section with a report in accordance with chapter 74.13 RCW, and where necessary to refer such report to the court.
> A law enforcement officer may take, or cause to be taken, a child into custody without a court order if there is probable cause to believe that the child is abused or neglected and that the child would be injured or could not be taken into custody if it were necessary to first obtain a court order pursuant to RCW 13.34.050. The law enforcement agency or the department investigating such a report is hereby authorized to photograph such a child for the purpose of providing documentary evidence of the physical condition of the child.

A cause of action for negligent investigation under RCW 26.44.050 is present when the

failure to adequately investigate results in "a placement decision to remove a child from a

nonabusive home, let a child remain in an abusive home, or place a child in an abusive home."

*M.W.*, 149 Wn.2d at 595. To prevail on a negligent investigation claim, the claimant must prove

that the faulty investigation was a proximate cause of the harmful placement. *McCarthy v. County*

*of Clark*, 193 Wn. App. 314, 329, 376 P.3d 1127, *review denied*, 186 Wn.2d 1018 (2016).

Proximate cause includes two elements: cause in fact and legal causation. *Id.* Cause in

fact exists when "but for" the defendant's actions, the claimant would not have been injured. *Id.*

Legal causation involves a policy determination as to how far the consequences of an act should extend and is generally a legal question. *Id*.

      1.     2011 Investigation

The appellants in this case argue that the TPD officers' failure to remove the children from the home based on the 2011 welfare check resulted in leaving M.E. and J.E. in a home with their abuser. However, the appellants fail to show that there is a genuine issue of material fact that the TPD investigation resulted in a harmful placement decision because, even taking the facts in the light most favorable to the plaintiff, there is no evidence that any sexual abuse occurred in the home in 2011. Therefore, the TPD investigation did not result in leaving the children in an abusive home.

Based on M.E.'s disclosure, Karlan's abuse occurred from the fall of 2012 until the end summer of 2013. Therefore, based on M.E.'s own disclosure, the TPD did not leave her in an abusive home following the welfare check because, at the time, there was no disclosed abuse occurring in the home.

Because there is no genuine issue of material fact as to whether the TPD investigation resulted in leaving the children in an abusive home, the appellants failed to meet their burden. *Young*, 112 Wn.2d at 225. Accordingly, summary judgment dismissal of appellants' negligence claim based on the 2011 investigation was proper.

      2.     2012 Investigation

Similarly, the appellants argue that the TPD officers' failure to remove the children from the home based on the 2012 investigation into the "ghost" referral resulted in leaving M.E. and J.E. in a home with their abuser. However, the appellants fail to show that there is a genuine issue

of material fact that the TPD investigation resulted in a harmful placement decision because, even taking the facts in the light most favorable to the plaintiff, there is no evidence that any sexual abuse occurred in the home in early 2012 when the "ghost" referral was investigated. Therefore, the TPD investigation did not result in leaving the children in an abusive home.

Again, based on M.E.'s disclosure, Karlan's sexual abuse occurred from the fall of 2012 until the end of summer of 2013. Therefore, based on M.E.'s own disclosure, the TPD did not leave her in a sexually abusive home following the welfare check because, in January 2012, there was no evidence that sexual abuse was occurring in the home. Because the appellants failed to meet their burden to show a genuine issue of material fact regarding whether the TPD investigation resulted in a harmful placement decision, summary judgment was proper.

3.      2013 Investigation

As to the 2013 investigation, the appellants assert that the City's failure to contact Drayton and Eddo regarding J.B.'s allegations and the failure to reopen the 2012 investigation left Karlan with unfettered access to the children. But the appellants' allegations do not create a genuine issue of material fact regarding whether the TPD investigation in 2013 resulted in a harmful placement decision—leaving the children in an abusive home.

Here, the City did not have a report of sexual abuse concerning M.E. and J.E. The City had a report of sexual abuse concerning J.B. because J.B. made a clear and credible disclosure of abuse against Karlan. Although J.B. disclosed that the abuse happened at M.E. and J.E.'s house, J.B. did not disclose that any abusive conduct involved M.E. or J.E., and J.B. did not disclose that M.E. and J.E. observed any of the abuse.

13

Also, TPD contacted Drayton about J.B.'s allegations against Karlan, and Drayton told Detective Quilio that neither M.E. nor J.E. made any disclosures of sexual abuse by Karlan. Quilio also contacted Eddo about J.B.'s allegations. Eddo later told Quilio in a message that he had discussed Karlan with M.E. and J.E. and neither child disclosed any sexual abuse by Karlan. Because there were no disclosures of abuse against M.E. and J.E., there was no report of abuse or neglect for the detectives to investigate. Accordingly, a duty to investigate under RCW 26.44.050 was not triggered.

Also based on the record before us, M.E. first disclosed that Karlan was sexually abusing her in October 2013, months after the investigation into J.B.'s allegations and despite having been previously questioned by her parents after TPD informed Drayton and Eddo about J.B.'s sexual abuse allegations. And there is no evidence in the record that J.E. ever disclosed that she was sexually abused by Karlan. Thus, there is no evidence that "reopening" the 2012 investigation would have accomplished anything different than what occurred in this case. Accordingly, the appellants have failed to show a genuine issue of material fact that failure to reopen the 2012 investigation resulted in a harmful placement decision.

The appellants failed to meet their burden to show a genuine issue of material fact existed as to cause in fact that TPD's conduct relating to the 2013 investigation into J.B.'s sexual abuse allegations against Karlan resulted in a harmful placement decision relating to M.E. and J.E. Therefore, the superior court properly granted the City's motion for summary judgment dismissal of the appellants' negligence claim based on the 2013 investigation.

14

C.      COMMON LAW DUTIES

      1.      Duty to Protect: *H.B.H.*

In *H.B.H.*, our Supreme Court recognized a common law duty requiring DSHS to protect foster children from abuse based on a special relationship exception to the general rule that a party is not required to protect against the criminal acts of a third party. 192 Wn.2d at 178. The appellants argue that under *H.B.H.*, law enforcement had a special relationship with M.E. and J.E. that imposed a duty to protect on law enforcement. We disagree.

In *H.B.H.*, our Supreme Court recognized the general rule that a person has no duty to control the actions of third parties. 192 Wn.2d at 168. However, the court held that in certain circumstances, a special relationship exists between a defendant and a victim that creates a duty to protect the victim from the tortious conduct of third parties. *Id.* at 168-69. In determining that DSHS has a special relationship with foster children, our Supreme Court provided extensive analysis of the legal relationship created between DSHS and foster children when DSHS removes foster children from their parents. *Id.* at 163-68. The Supreme Court concluded:

> In sum, the establishment of a dependency imposes essential rights and duties on the State to care for dependent children. *See, e.g.*, RCW 74.13.010 (duty to protect and care for dependent children), .031(3) (duty to investigate complaints of neglect, abuse, or abandonment of children), (6) (duty to monitor foster care placements), (7) (duty to provide child welfare services to dependent children), (9) (DSHS authorized to purchase care for dependent children). The State becomes the legal custodian of the dependent child, and the State alone controls the services provided to the child and determines where the child will reside. *See* JuCR. 3.8(e); RCW 13.34.130(1)(b)(ii); RCW 74.13.031(7). It is against this statutory backdrop that we consider whether DSHS's relationship with dependent foster children creates a special relationship supporting a common law duty in this case.

*Id.* at 168.

15

Our Supreme Court then explained that the legal relationship between DSHS and foster children was a special relationship under RESTATEMENT (SECOND) OF TORTS §315(b). *Id.* at 178. The Supreme Court explained that DSHS is the "'custodian and caretaker of foster children[,]'" and, therefore, DSHS had taken custody of foster children. *Id.* at 170-71 (quoting *Braam ex rel. Braam v. State*, 150 Wn.2d 689, 700, 81 P.3d 851 (2003)). The Supreme Court also stated that the "entrustment for the protection of a vulnerable victim, not physical custody, is the foundation of a special protective relationship." *Id.* at 173. Those relationships are also "'based on the liable party's assumption of responsibility for the safety of another.'" *Id.* (quoting *Niece v. Elmview Group Home*, 131 Wn.2d 39, 46, 929 P.2d 420 (1997)).

Here, the appellants broadly characterize the holding of *H.B.H.* as reaffirming "that where there is a special protective relationship between a public agency and child abuse victims, the agency owes the children a duty of care." Br. of Appellant at 15. But this is not what *H.B.H.* held. *H.B.H.* only addressed whether there was a special relationship between DSHS and foster children. *H.B.H.*, 192 Wn.2d at 178. Nothing in *H.B.H.* indicates that the court considered any broader context. In fact, *H.B.H.* does not even establish a special relationship between DSHS and children who are not in the legal custody of DSHS.

Based on the use of the terms "entrustment and vulnerability," the appellants assert that *H.B.H.* applies equally to law enforcement officer investigating discreet reports for children who are not dependent children. Br. of Appellant at 16. However, none of the justifications for finding a special relationship between DSHS and foster children applies to law enforcement. The Supreme Court's holding analyzed the unique relationship between DSHS and foster children based on the fact that DSHS becomes the legal custodian of foster children once they are the subject of a

dependency action. *H.B.H.*, 192 Wn.2d at 168 ("In sum, the establishment of a dependency imposes essential rights and duties on the State to care for dependent children."). No such relationship exists between law enforcement and a child that may be involved in an investigation. Even when law enforcement officers take a child into protective custody, the law enforcement officer transfers that child to care and custody of DSHS. *See* RCW 26.44.056. And here, M.E. and J.E. were not dependent children. Therefore, the legal relationship that *H.B.H.* recognized between DSHS and foster children does not exist in this case.

We hold that the special relationship creating a duty to protect recognized in *H.B.H.* does not extend to law enforcement agencies investigating allegations of child abuse. Law enforcement agencies do not have any legal relationship that makes them responsible for the protection of children independent of the duty to investigate. Accordingly, we hold that the City had no common law duty arising out of the special relationship recognized in *H.B.H.*

2.      Common Law Duty to Act Reasonably

In addition to their references to RCW 26.44.050 and the common law duty identified in *H.B.H.*, the appellants note that "[u]nder the common law, in general, where police officers act, 'they have a duty to act with reasonable care.'" Br. of Appellant at 15 n.10 (quoting *Coffel v. Clallam County*, 47 Wn. App. 397, 403-04, 735 P.2d 686, *review denied*, 108 Wn.2d 1014 (1987). The appellants only make this assertion in a footnote. They do not appropriately define the scope or nature of an actionable common law duty against law enforcement. Nor do the appellants actually apply the assertion to the facts of this case. We will not consider issues that are not supported by argument or citation to authority. RAP 10.3(a)(6); *Cowiche Canyon Conservancy v.*

*Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992). Accordingly, we decline to consider whether the City owed M.E. and J.E. a common law duty to act reasonably.

D.    NEGLIGENT TRAINING AND SUPERVISION CLAIM

The appellants appear to raise an issue regarding the dismissal of their claim that the City "breached its duty when, among other things, it negligently hired, trained, supervised, and monitored its personnel." CP at 5. We decline to consider whether the superior court erred by dismissing the appellants' claim because the appellants do not offer any argument or authority supporting the assertion that the superior court erred by dismissing this claim. Instead, the appellants only present a footnote, noting:

> As befits its cavalier treatment of the issues in this case, the trial court's orders nowhere reflect its disposition of the children's negligent training/supervision theory. They pleaded that issue. CP 5. They specifically mentioned it in responding to the City's motion for summary judgment. CP 656-57. But the trial court's orders do not address this issue.

Br. of Appellant at 9 n.8. However, even though the superior court did not specifically address this claim, the superior court did dismiss all of the appellants' claims, which included a claim that the City "breached its duty when, among other things, it negligently hired, trained, supervised, and monitored its personnel." CP at 5.

The appellants assigned error to all the superior court's orders. But the appellants did not provide any argument or authority to support reversing the superior court's order dismissing a negligent training and supervision claim. We will not consider issues or assignments of error that are not supported by argument or authority. RAP 10.3(a)(6); *Cowiche Canyon Conservancy*, 118 Wn.2d at 809. Accordingly, we do not consider whether the superior court erred by granting the City's motion for summary judgment and dismissing the appellants' claim for negligent training

18

No. 53011-2-II

and supervision based on the allegation that the City "breached its duty when, among other things, it negligently hired, trained, supervised, and monitored its personnel."  CP at 5.

## CONCLUSION

We hold that the appellants' negligence claim under RCW 26.44.050 fails as a matter of law because none of the City's actions resulted in a harmful placement decision.  We also hold that the special relationship in *H.B.H.* does not extend to law enforcement, and therefore, the appellants' claim that there is a common law duty to protect based on a special relationship recognized in *H.B.H* fails.  And the appellants have failed to adequately argue a common law duty based on affirmative actions.  Accordingly, we affirm the superior court's orders granting the City's motions for summary judgment.

_____, C.J.
Lee, C.J.

We concur:

_____
Worswick, J.

_____
Melnick, J.

19