# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| W.M., a minor, by ERIN OLSON, his Litigation Guardian ad Litem and JAMES MANEY, <br><br> Appellants, <br><br> v. <br><br> STATE OF WASHINGTON, <br><br> Respondent. | No.  55007-5-II <br><br><br><br> PUBLISHED OPINION |

LEE, C.J.—W.M.,[1] through his litigation guardian ad litem (GAL) Erin Olson, and his father James[2] sued the State for the negligent investigation of a child abuse report involving two-year-old W.M.  Olson appeals the trial court's grant of summary judgment in favor of the State.  We hold that the superior court properly granted summary judgment in favor of the State and affirm.

## FACTS

### A.    INCIDENT BACKGROUND

James and Katelyn, W.M.'s mother, were married from 2015 to 2017.  W.M. was born in July 2015 in Longview.  James and Katelyn moved to Tennessee in 2016.  In 2017, Katelyn left James and returned to Washington with W.M.  Katelyn then filed a dissolution action in

---

[1]  We use W.M.'s initials to protect his privacy.  Because identification of close family members could lead to the identity of W.M., we also refer to those adults by their first names.  We intend no disrespect.

[2]  For ease of reference, we refer to the appellants collectively as Olson.  We will use W.M. and James when we refer to them in their individual capacities.

Washington. The Cowlitz County superior court entered a temporary parenting plan giving Katelyn primary residential custody of W.M. The temporary parenting plan allowed James visitation with W.M. when James was in the local area.

On December 9, 2017, Katelyn brought W.M. to the emergency room at Legacy Mount Hood Medical Center (LMHMC) in Gresham, Oregon because he had ingested Suboxone.[3] Antoinette Teixeira, a hospital social worker, contacted Oregon Child Protective Services to report the Suboxone ingestion. Because Katelyn claimed that the ingestion occurred at her parents' home in Washington, Teixeira also called Washington Child Protective Services (CPS)[4] to report the Suboxone ingestion.

W.M. was transferred to Legacy Randall Children's Hospital in Portland, Oregon. On December 9, Kimberly Hartnagel, a CPS after-hours investigator, met with Katelyn and W.M. at Randall Children's Hospital. Hartnagel did not document any concerns about Katelyn's appropriateness with or attentiveness towards W.M. W.M. was scheduled to be discharged from the hospital on December 10.

Eight days later, on December 18, Katelyn and her boyfriend, Samuel Rich, brought W.M. to the emergency department at LMHMC again. W.M. was unresponsive, was not breathing, had no pulse, and was cold to the touch. W.M. had multiple abrasions, contusions and bruises; doctors also determined that W.M. had bleeding and swelling in his brain. Katelyn gave different explanations for how W.M.'s injuries occurred.

---

[3] Suboxone is a prescription drug used to treat pain as well as drug addiction.

[4] At the time of CPS's investigation, CPS was a subdivision of the Department of Social and Health Services (DSHS).

W.M. was transferred from LMHMC to Emanuel Hospital in Portland, Oregon. A law enforcement officer from Gresham Police Department met with Katelyn at Emanuel Hospital.

Katelyn initially told law enforcement officer that she was walking with W.M. at the time of the incident, but Katelyn's mother, Sally, interrupted Katelyn and told her to tell the truth. Katelyn then told the officer that she was at work when Rich called her to tell her that W.M. had fallen out of his high chair. When the officer asked Katelyn why she did not call 911, she explained that the hospital was right around the corner. When the officer asked Katelyn why Rich did not call 911, she stated that he did not know to do that because he did not have kids.

The officer then interviewed Rich. Rich told the officer that WM was playing with the dog on the stairs, fell four to five steps, and landed on tile. Multnomah County Sheriff's Office detectives then took over the investigation because of where the injury occurred.

On December 19, Detective Kate Lazzini of the Multnomah County Sheriff's Office conducted a recorded interview with Katelyn regarding W.M.'s injuries. Katelyn stated that she got off work around 5:00 PM and was driving to Rich's when he called her to tell her that she needed to get home right away because W.M. had fallen and was unconscious. Katelyn said that she asked Rich how severe W.M.'s injuries were and whether they needed to call 911. Rich told Katelyn that he was not sure about the extent of W.M.'s injuries and that he was trying to wake WM up by splashing water on him. When Katelyn arrived at Rich's house, she explained that she took a couple of minutes to assess the situation to decide if they needed to take W.M. to the hospital.[5]

---

[5] As a result of the incident involving W.M., an Oregon grand jury indicted Rich with first degree assault and multiple counts of first degree criminal mistreatment and third degree assault.

3

As a result of the assault, W.M. suffered severe, permanent brain damage. W.M. requires constant care for all daily activities.

B.     WA CPS INVESTIGATION

1.     Initial CPS Investigation into Suboxone Ingestion

The initial report of W.M.'s Suboxone ingestion came into CPS intake on a Saturday, which was after normal business hours. An intake report was created based on Teixeira's report to CPS on December 9, 2017. The intake report included Katelyn's original report that the Suboxone ingestion occurred at her home in Washington and she did not know how W.M. ingested the Suboxone. The intake also noted that there was no prior history in the CPS "Famlink" system.

Intake contacted the after-hours supervisor to staff the intake because W.M. had ingested Suboxone, which placed him in present or impending danger. The after-hours supervisor assigned the intake to Hartnagel.

Suboxone ingestion raises concerns for lack of supervision as well as concerns about potential drug abuse. Therefore, under CPS policy, Hartnagel was required to make an attempt to see the child within 24 hours.

When Hartnagel received the intake for W.M., she went to the hospital and spoke with the registered nurse who was caring for W.M. Hartnagel also interviewed Katelyn at the hospital.

Katelyn told Hartnagel that W.M. ingested the Suboxone while they were at her boyfriend's house. Hartnagel could not recall if she specifically asked Katelyn for her boyfriend's name. In her deposition, Hartnagel explained that the information would be important if CPS determined a background check was necessary. She said the agency might request a background check if the

boyfriend lived in the home, was present during the reported incident, or had a lot of access to the child.

Hartnagel stated that it would be her normal response to try to contact the biological father and tell him the child was in the hospital. Hartnagel did not follow up on contacting James because she believed it was appropriate for the assigned social worker to do that as part of the follow-up investigation.

Hartnagel's report states medical staff did not report any concerns regarding Katelyn and she has been appropriate with the child. Medical staff also reported that the child was doing well and would likely be discharged the next day, December 10. Hartnagel observed Katelyn interact with W.M., and Katelyn was appropriately concerned and attentive.

Katelyn explained to Hartnagel that W.M. ingested the Suboxone while they were at her boyfriend's house, where Katelyn had been intending to surprise her boyfriend by putting up Christmas decorations while her boyfriend was at work. Katelyn said her boyfriend was not at the home when the Suboxone ingestion occurred. Katelyn reported that there were baby gates at her house and at her boyfriend's house. Katelyn also told Hartnagel that she did not have contact information for James, but she would have her attorney inform his attorney about the Suboxone ingestion on Monday. Hartnagel informed Katelyn that another social worker would be assigned to conduct a follow-up investigation, and Katelyn provided her contact information. After Hartnagel's interview with Katelyn, the hospital discharged W.M. to Katelyn's care.

Katie Palmquist was assigned to continue the CPS investigation. On December 11, Palmquist contacted Katelyn to arrange to visit W.M. in the home. Katelyn told Palmquist that Sally watched W.M. during the day while she was at work and provided Sally's contact

information for Palmquist to arrange the home visit. Palmquist arranged to visit Sally at her home on December 13.

During the home visit, Palmquist observed that W.M. acted as a typical two year old. The home was clean and had several baby gates and safety locks. Sally told Palmquist that she did not have any concerns regarding Katelyn's care of W.M. Sally identified Rich as Katelyn's boyfriend and stated she had been to his house and did not think that it was unsafe. Sally believed the Suboxone ingestion was a one-time incident, and she did not believe anything like it would happen again. Sally agreed to call CPS if she had any concerns about Katelyn caring for W.M.

In her deposition, Palmquist explained that initial face-to-face contact with the child was required to occur within 24 or 72 hours, depending on the type of referral. CPS had 60 days to complete remaining aspects of the investigation.

2.     Investigation Following December 18 Hospitalization

When CPS was informed of W.M.'s December 18 hospitalization, and the possibility that he was seriously harmed by Rich, Jennifer Gorder of CPS contacted Oregon Child Welfare. Oregon Child Welfare confirmed that they had an open intake regarding W.M. Oregon Child Welfare also informed Gorder that Rich had a founded investigation for harming his ex-girlfriend's toddler about six years ago. Gorder recorded the contact with Oregon CPS:

> Samuel Rich has a prior FOUNDED for physical abuse against his former girlfriend's child. Girlfriend is [redacted]. Child was too young to disclose but presented with injuries to the child's face and legs that were consistent with physical abuse. An older child, sibling, disclosed seeing the abuse.

Clerk's Papers (CP) at 343. Gorder stated that if CPS had known of the Oregon founded determination, they would have been concerned and addressed that with Katelyn. Initially, they

would have had a conversation about it with Katelyn and then decided how to proceed based on her response.

On December 20, Palmquist contacted James. James told Palmquist that he had been in contact with Katelyn's father, who said that W.M. fell down the stairs but was doing better. Palmquist informed James that CPS believed W.M.'s injuries were caused by abuse and recommended James come to the hospital as soon as possible.

James also told Palmquist about his concerns about Katelyn. James told Palmquist that there was an ongoing custody case regarding W.M. and that the GAL in the dissolution proceeding had recommended that he have full custody of W.M. He also told Palmquist that the dissolution GAL did not know about Rich until Rich dropped W.M. off at a custody exchange.

Katelyn continued to defend Rich after W.M. was hospitalized. Notes from W.M.'s medical records show that Katelyn did not believe Rich intentionally harmed W.M. Palmquist received a report from the hospital team which she recorded as follows:

> Investigator Palmquist rtcf Amanda from CARES team. She said that she and Dr. McCraig talked with [Katelyn] and [Maternal Grandmother (MGM)] Sally and presented all of the medical information and concerns that they had about [W.M.'s] injuries being caused by abuse. [Katelyn] became very defensive and angry and said that no one knows [Rich] like she does and why isn't anyone concerned about how he is feeling guilty about being home when [W.M.] fell? MGM Sally stepped in and told [Katelyn] that they are trying to tell her that someone hurt [W.M.] and that his medical care was postponed which most likely caused more injury to him, and [Katelyn] started yelling at MGM Sally. MGM shut down and did not talk anymore. Amanda let this investigator know that she talked to the detectives after this and [Katelyn] had already texted Mr. Rich to let him know that [Law Enforcement (LE)] thought he did this while LE was there questioning him.

CP at 339. Katelyn refused to further cooperate with CPS's investigation.

C.   INFORMATION FROM DISSOLUTION PROCEEDINGS

Katelyn had filed a petition for dissolution of her marriage with James in March 2017. Katelyn included a request for a restraining order against James in her petition for dissolution. The temporary parenting plan restricted both parents from using marijuana and required them to submit to drug testing. The Cowlitz County Superior Court appointed a GAL in the dissolution.

The GAL submitted her report on October 23, 2017. The GAL recommended that James become W.M.'s primary parent and be granted sole decision-making authority for W.M. Both Katelyn and James made accusations of domestic violence against the other. Based on the investigation, the GAL opined that Katelyn had perpetrated domestic violence against James.

The GAL expressed concerns about Katelyn's stability and W.M.'s well-being. The GAL noted that Katelyn had just moved W.M. from Tennessee to Washington and planned to move to her boyfriend's home as soon as "she 'figures out' how she can do this through the courts." CP at 138. The GAL stated, "None of the mother's moves are geared toward the child, her independence or long-term stability for either of them." CP at 135. In addition, the GAL determined that Katelyn had "little regard to the emotional needs and developmental level of" W.M. because she saw no reason for W.M. to continue a relationship with James, her interference in James' relationship with W.M., and the sudden introduction of her boyfriend as a replacement parental figure for W.M. CP at 136.

The GAL further expressed concerns about Katelyn's dishonesty, especially regarding her living situation. The GAL noted that Katelyn and W.M. spent overnights at her boyfriend's house and that W.M. had his own bedroom there. The GAL concluded, "It appears that even though she professes to be living in Washington, and just hoping to move to Oregon, that she spends a

significant amount of time in Oregon." CP at 138. Further, Katelyn refused to disclose where her boyfriend lived, only telling the GAL that he lived near Portland. The GAL also noted difficulty in following Katelyn's time line of specific events in the case.

D.  SUMMARY JUDGMENT

Olson filed a complaint against the State[6] for W.M.'s injuries, claiming CPS was negligent and conducted a negligent investigation.[7] The State filed a motion for summary judgment on Olson's claims.

In addition to pleadings establishing the facts as stated above, Olson presented depositions and declarations from expert witness, Barbara Stone. Stone opined that CPS did not meet the standard of care during the investigation into the Suboxone ingestion. Stone's deposition included the following exchange,

> Q. . . . Do you have an opinion on whether or not [W.M.] should have been removed from Katelyn . . . at the point of the December 9th, 2017 intake?
> **A. No. My opinion is, based on—that they needed to do the safety plan which was involved in an assessment of all the adults that was around [W.M.] and then make that decision based on the best information that they had.**

CP at 456. Stone recognized that the investigation remained open after Palmquist's home visit was completed.

---

[6] The complaint lists DSHS as an agency of the State.

[7] Although Olson filed a general negligence claim, the record shows that Olson conflated the general negligence claim with the negligent investigation claim and only pursued a negligent investigation claim.

In a declaration, Stone opined that Hartnagel's primary responsibility was to ensure W.M.'s safety. Further, Stone opined the Hartnagel was required to involve both parents in the investigation. And Stone opined:

> 6. Ms. [Hartnagel] obtained information that the Suboxone poisoning occurred at [Katelyn's] boyfriend's home in Gresham, OR. [Katelyn] was clearly spending time with WM at her boyfriend's, as she was putting up Christmas decorations and reported his house had baby gates. It was incumbent on Hartnagel to get his identity and check his background. CPS workers routinely share information from child abuse registries with workers from other states, because parents moving from one state to another is commonplace. A phone call to Oregon would have revealed Sam Rich's founded child abuse incident against a girlfriend's two-year-old child.

CP at 941. Stone also asserted that CPS should have contacted Teixeira directly and such contact would have revealed Katelyn's inconsistent stories regarding the Suboxone ingestion. Stone ultimately concluded:

> CPS had 60 days to investigate and determine whether the report of abuse/neglect against [Katelyn] was founded. During the entire time, WM's safety was supposed to be the first priority. The considerations are supposed to be embodied in a "Safety Plan." Such a plan does not necessarily or even frequently involve removal from the parent's custody. However, given what CPS should have known about [Katelyn] and Sam Rich, a safety plan would undoubtedly have included no contact with Sam Rich.

CP at 942. Stone also opined that, on the day of the Suboxone poisoning, CPS should have identified Rich as a threat to W.M. and required an agreement from Katelyn and her parents that W.M. would not go to Rich's home or be alone with Rich. In a supplemental declaration, Stone further explained:

> In this case, had Hartnagel or Palmquist taken the proper steps, they would have met with [Katelyn], confronted her with issues regarding her conflicting stories, the substance abuse concerns, and the child abuse history of Sam Rich. A safety plan would have included keeping WM away from Sam Rich. Given [Katelyn] was living with her parents and they were caregivers for WM, a meeting should have

included [Katelyn]'s parents. This was the responsibility of the Department, separate from whatever action James . . . took in the custody case. Had the investigator met with [Katelyn] and determined she was not protective, and her parents would not ensure compliance, WM could have been removed and a dependency petition filed.

CP at 1099.

The State presented declarations from their own expert witness, Maria Scannapieco.

Scannapieco summarized her opinion in a declaration:

This is an unfortunate case involving a two-year old boy who sustained brutal injuries while in the care of Sam Rich, the boyfriend of W.M.'s biological mother, Katelyn . . . . This incident occurred just nine days after the State of Washington (State) investigated an unrelated incident in which W.M. accidentally ingested Suboxone. One of the questions I was asked to review and address is whether the State's investigation conformed with accepted standards of practice for social workers. Although the State had not completed its investigation at the time Sam Rich physically abused W.M., its investigation of the incident involving the accidental ingestion of suboxone conformed with accepted standards of social work practice. Further, it is abundantly clear the State acted with substantial care in its investigation of this incident.

CP at 493-94. Scannapieco recognized that CPS could have learned that Rich "had a prior founded finding of physical abuse concerning two young girls from six years earlier." CP at 496. However, Scannapieco opined that this additional information would not have been sufficient to remove W.M. from Katelyn's care. Scannapieco opined:

At most, the State could have asked Katelyn . . . to enter into a voluntary safety plan. However, such a plan would have been, by definition, voluntary. It could not have been enforced in a court of law, and would not have served as a bar to Katelyn . . . allowing W.M. to stay with Sam Rich while she was at work on December 18, 2017. Thus, even if the State had gathered the additional information that we now know existed prior to December 18, 2017, no action could have been taken by the State to prevent W.M. from the physical abuse he suffered.

CP at 496. In her deposition, Scannapieco opined that prior to December 18, CPS had no basis for removing W.M. from Katelyn's home. Scannapieco also explained:

11

Further, as there were no allegations or evidence that Mr. Rich ever abused or neglected WM in any way prior to December 18, 2017, even if [Katelyn] allowed contact between WM and Rich, that would not automatically or necessarily have justified the removal of WM from his mother's custody or the filing of a dependency petition. Rather, such information would have been folded into and considered along with all other known information at that time. Then a reasonably prudent social worker would conduct a new assessment to determine whether WM was, at that time, at risk of imminent harm. Again, what result would come from such a hypothetical assessment is pure speculation.

CP at 1142-43.

D.    SUPERIOR COURT RULINGS

The superior court granted the State's motion for summary judgment and dismissed Olson's complaint. Olson filed a motion for reconsideration supported by an additional declaration from Stone. The superior court denied Olson's motion for reconsideration.

Olson appeals.

ANALYSIS

Olson argues that questions of fact exist whether the State's negligent investigation resulted in a harmful placement decision and was a proximate cause of W.M.'s injuries. We disagree.

A.    STANDARD OF REVIEW

We review summary judgment orders de novo. *Desmet v. State by and through Dep't of Soc. and Health Servs.*, 17 Wn. App. 2d 300, 307, 485 P.3d 356 (2021). Summary judgment is appropriate if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Id.*; CR 56(c). A genuine issue of material fact exists if reasonable minds could disagree on the conclusion of a factual issue. *Sartin v. Estate of McPike*, 15 Wn. App. 2d 163, 172, 475 P.3d 522 (2020), *review denied*, 196 Wn.2d 1046 (2021). We review all facts

and reasonable inferences drawn from those facts in the light most favorable to the nonmoving party. *Id.*

"The party moving for summary judgment bears the initial burden to show there is no genuine issue of material fact." *Id.* If a moving defendant shows that there is an absence of evidence to support the plaintiff's case, then the burden shifts to the plaintiff to present specific facts that reveal a genuine issue of material fact. *Id.* "Summary judgment is appropriate if a plaintiff fails to show sufficient evidence that creates a question of fact about an essential element on which he or she will have the burden of proof at trial." *Id.* An expert opinion may be sufficient to create a genuine issue of material fact and defeat summary judgment. *Id.* But an expert's opinion must be grounded in fact, and statements that are speculative or based on assumptions will not preclude summary judgment. *Id.* at 173.

B.     LEGAL PRINCIPLES OF NEGLIGENT INVESTIGATION

There is no general tort claim for negligent investigation against the State. *Desmet*, 17 Wn. App. 2d at 309. "A plaintiff does not have an actionable breach of duty claim against [the State] 'every time the State conducts an investigation that falls below a reasonable standard of care by, for example, failing to follow proper investigative procedures.'" *Albertson v. State*, 191 Wn. App. 284, 300, 361 P.3d 808 (2015) (quoting *Petcu v. State*, 121 Wn. App. 36, 59, 86 P.3d 1234, *review denied*, 152 Wn.2d 1033 (2004)).

However, in *Tyner v. Department of Social and Health Services*, the Supreme Court recognized and the State agreed that children have an implied cause of action against the State under RCW 26.44.050 for negligent investigation of child abuse allegations. 141 Wn.2d 68, 77, 1 P.3d 1148 (2000). "[A] claim for negligent investigation against [the State] is available only to

children, parents, and guardians of children who are harmed because [the State] has gathered incomplete or biased information that *results in a harmful placement decision*, such as removing a child from a nonabusive home, placing a child in an abusive home, or letting a child remain in an abusive home." *M.W. v. Dep't of Soc. & Health Servs.*, 149 Wn.2d 589, 602, 70 P.3d 954 (2003) (emphasis added). An essential element of a negligent investigation claim under RCW 26.44.050 is that the alleged negligent investigation was a proximate cause of a harmful placement decision. *Desmet*, 17 Wn. App. 2d at 310.

C.     HARMFUL PLACEMENT DECISION

Olson argues that there was a harmful placement decision in this case because a harmful placement decision includes when the State allows a child to remain in a home and abuse later occurs. We disagree because there are no genuine issues of material fact as to whether the State made a harmful placement decision.

This court recently addressed a similar question in *M.E. v. City of Tacoma*, 15 Wn. App. 2d 21, 471 P.3d 950 (2020), *review denied*, 196 Wn.2d 1035 (2021). In *M.E.*, law enforcement had contact with the children in October 2011 and January 2012. *Id.* at 24-25. In April 2013, law enforcement began investigating allegations that the children's mother's boyfriend, who lived in the home with the children, had sexually molested another child. *Id.* at 27-28. The boyfriend was eventually located and arrested in August 2013. *Id.* at 28. Later, one of the children disclosed that she had been sexually abused by the mother's boyfriend from the fall of 2012 until the summer of 2013. *Id.* at 30. The children sued law enforcement for negligent investigation. *Id.* at 23.

This court in *M.E.* held that there could be no cause of action for negligent investigation based on the 2011 and 2012 investigations because the children were not left in an abusive home.

*Id.* at 33-34.  As to the 2011 investigation, *M.E.* explained, "based on M.E.'s own disclosure, the [Tacoma Police Department (TPD)] did not leave her in an abusive home following the welfare check [in 2011] because, at the time, there was no disclosed abuse occurring in the home."  *Id.* at 33.  And as to the 2012 investigation, *M.E.* explained, "based on M.E.'s own disclosure, the TPD did not leave her in a sexually abusive home following the [2012] welfare check because, in January 2012, there was no evidence that sexual abuse was occurring in the home."  *Id.* at 34.  Thus, there must be some evidence that abuse has occurred or abuse was occurring in the home *at the time of the placement* in order for the child to be left in an abusive home.  *See Id.* at 33-34.

Here, the alleged harmful placement decision occurred when the State allowed W.M. to leave the hospital and return home with Katelyn after the Suboxone ingestion.  At the time that W.M. left the hospital there was no evidence that any abuse had occurred in either Katelyn's or Rich's homes.  Significantly, there are no allegations that Rich had engaged in any acts of physical abuse toward W.M. prior to the assault on December 18.  Therefore, between December 10 and December 18, W.M. could not have been placed or left in an abusive home because there was no evidence that abuse had occurred or was occurring in Katelyn's home.

Furthermore, the "placement decision" that was ultimately harmful was not the decision the State made.  It is undisputed that the abusive conduct was committed by Rich, at Rich's home.  Significantly, the State did not make the decision to place W.M. with Rich as his caregiver.  Here, the placement decision that the State made was to allow W.M. to remain in Katelyn's care in her parent's home.

And the State did not place W.M. in Rich's home or even make the decision to allow W.M. to remain in Rich's home.  Again, the placement decision that the State made was to allow W.M.

to remain in Katelyn's parents' home under Katelyn's care. Although Katelyn was spending time at Rich's house, it is undisputed that her parents' home was still her residence at the time of both the Suboxone ingestion and the December 18 abuse. And neither Katelyn nor Sally identified Rich as one of W.M.'s caregivers. Therefore, the State did not make the decision to place W.M. in a home and/or with a caregiver that ultimately resulted in the harm to W.M.

Because there was no evidence that abuse had occurred or was occurring at Katelyn's home, the State did not make a harmful placement decision by allowing W.M. to go home from the hospital with his mother.

D.    PROXIMATE CAUSE

Olson argues that questions of fact exist whether the CPS's negligent investigation was a proximate cause of W.M.'s injuries because had the State done a background check on Rich, W.M. would not have been injured. We disagree.

Proximate cause typically is a question for the jury. *McCarthy v. Clark County*, 193 Wn. App. 314, 329, 376 P.3d 1127, *review denied*, 186 Wn.2d 1018 (2016). But proximate cause cannot be based on mere speculation. *Estate of Bordon v. Dep't of Corr.*, 122 Wn. App. 227, 241-42, 95 P.3d 764 (2004), *review denied*, 154 Wn.2d 1003 (2005).

Here, Olson relies on mere speculation to support causation. Any claim that the State would have prevented the harm to W.M. by conducting a background check on Rich is purely speculative. Olson contends that W.M. would not have been injured if the State had done a background check because the State would have put a safety plan in place preventing Rich from having contact with W.M. once it discovered Rich's prior involvement with Oregon Child Welfare and the State would have removed W.M. from Katelyn had she not followed the State's safety

16

plan. But even assuming that Hartnagel or Palmquist ran a background check on Rich during the nine days between allowing W.M. to go home with Katelyn from the hospital and Rich's abuse of W.M., to say that injury to W.M. would have been prevented because a safety plan would have been put in place to prevent contact between W.M. and Rich and that the State would have removed W.M. from Katelyn had she not followed the hypothetical safety plan is completely unsupported by any actual evidence in the record.

And even if Hartnagel or Palmquist ran a background check on Rich during the nine days after receiving the referral and learned of his prior history with Oregon Child Welfare, the evidence establishes that such information would have led to a social worker having a conversation with Katelyn about the discovery.

Further, even if that conversation between a social worker and Katelyn led to the implementation of a voluntary safety plan, there is simply no evidence in the record that Katelyn would have followed whatever voluntary safety plan that may have been put into place. In fact, the evidence in the record shows that Katelyn would not have followed the voluntary safety plan because Katelyn was supportive of and defended Rich, even after Rich abused W.M.

There also is no evidence that establishes what action Hartnagel or Palmquist would have considered appropriate if they had discovered Rich's six year old history with Oregon Child Welfare, made Katelyn aware of the information, and Katelyn rejected the information. Also, Rich's prior history with Oregon Child Welfare, while cause for concern, does not dictate that Katelyn must terminate all contact between Rich and W.M. or that W.M. would automatically be removed from Katelyn's home if she did not comply with any voluntary safety plan that may have been put in place.

17

No. 55007-5-II

Thus, while proximate cause typically is a question for the jury, proximate cause cannot be based on mere speculation. *McCarthy*, 193 Wn. App. at 329; *Bordon*, 122 Wn. App. at 241-42. Here, there is no evidence of causation and any possible question of fact relating causation is too speculative to defeat summary judgment.

CONCLUSION

There are no genuine issues of material fact as to whether the State placed or allowed W.M. to remain in an abusive home because there was no evidence that W.M. had been or was being abused—by Katelyn or Rich. Therefore, the CPS's decision to place W.M. with Katelyn did not result in a harmful placement decision. Further, any claim of causation based on the failure to do a background check is too speculative to defeat summary judgment. Thus, the State was entitled to judgment as a matter of law, and the superior court did not err in granting summary judgment in favor of the State. We affirm.

_____, C.J.
Lee, C.J.

I concur:

_____
Sutton, J.P.T.

18

MAXA, J. (dissenting) – Samuel Rich, the boyfriend of WM's mother, beat WM nearly to death in Rich's home. WM's expert testified that (1) the State's investigation of WM's Suboxone poisoning was negligent because the investigation failed to reveal that Rich had a founded finding for child abuse against a previous girlfriend's 2-year-old child, and (2) the State should have developed a safety plan that included no contact between WM and Rich. Questions of fact exist regarding negligence – and gross negligence if RCW 4.24.595(1) applies – and proximate cause.

Nevertheless, the majority holds that the State cannot be liable for its negligent investigation and its failure to remove WM from contact with a known child abuser even though, when viewed in a light most favorable to WM, that negligence was a cause of WM's injuries. The majority says that Rich's home was not an "abusive home" at the time of the State's investigation because Rich had not yet abused WM, and therefore the State cannot be liable as a matter of law. This holding makes no sense, and I dissent.

A child has a claim for negligent investigation against the State only if the State's negligent investigation results in a "harmful placement decision, such as removing a child from a nonabusive home, placing a child in an abusive home, or letting a child remain in an abusive home." *M.W. v. Dep't of Soc. & Health Servs.*, 149 Wn.2d 589, 602, 70 P.3d 954 (2003). The State's placement decision allowed Rich to have contact with WM. The issue here is whether that placement decision was "harmful."

*Of course* the State's placement decision was harmful to WM. This fact is undisputed. The State's placement decision resulted in Rich savagely beating WM and causing him permanent disabilities.

The majority focuses on whether the State allowed WM to remain in an "abusive home." But the actual requirement is a "harmful placement decision." *Id.* The three examples of a harmful placement decision listed in *M.W.* are preceded by the words "such as." *Id.* Use of "such as" indicates an illustrative list, not an exclusive list. *Schnitzer W., LLC v. City of Puyallup*, 190 Wn.2d 568, 582, 416 P.3d 1172 (2018). Therefore, there may be other types of harmful placement decisions not listed; they must only be similar in type to the three examples. *Id.*

Allowing a child to remain in close contact with a man whose background creates a significant risk that he would abuse the child is similar in type to allowing a child to remain in an abusive home. Therefore, I believe that at least a question of fact exists as to whether the State's decision to allow Rich to have continued contact with WM was a harmful placement decision.

I would reach the same conclusion even if an "abusive home" is required. A home where there is a significant risk that a child will be abused is by definition an abusive home, regardless of whether some abuse has yet occurred. The risk of and potential for abuse makes the home abusive. A few simple examples are illustrative. A structurally unsound house that could collapse at any time is dangerous, even though the house has not yet collapsed. A house containing a ticking time bomb is dangerous, even though the bomb has not yet exploded. Here, Rich was a ticking time bomb, creating a significant risk that he would once again abuse a young child.

A more pertinent example is the State letting a child remain the home of a man who has molested several young children previously. Under the majority's decision, the State would have no potential liability, even though some abuse is virtually inevitable, simply because no abuse

20

has occurred *yet*. That result would be absurd. Such a home necessarily is abusive, and the State should be subject to liability when the inevitable abuse occurs.

I would hold that a home containing a person whose background creates a significant risk that a child living in the home would be abused is an "abusive home" for purposes of negligent investigation liability, even if no abuse has yet occurred. Whether a person's background created such a significant risk would be a question of fact for the jury.

Such a rule would not be inconsistent with the result in *M.E. v. City of Tacoma*, 15 Wn. App. 2d 21, 471 P.3d 950 (2020), *review denied,* 196 Wn.2d 1035 (2021). In that case, ME lived with her mother and the mother's boyfriend. *Id.* at 24. ME alleged that her mother's boyfriend molested her beginning in the fall of 2012. *Id.* at 30. Tacoma police officers investigated ME's home in 2011 and January 2012 and did not remove ME from the home. *Id.* at 24-27. During the January 2012 investigation, ME actually was examined and interviewed at Mary Bridge Children's Hospital and denied any abuse. *Id.* at 25-27. The court held that these investigations did not result in harmful placement decisions because there was no evidence that sexual abuse of ME had occurred at the time of the investigations. *Id.* at 33-34.

In *M.E.*, there was no abusive home because there was no evidence that the boyfriend's presence in the mother's house created a significant risk that ME would be abused. Nothing in the record suggests that the boyfriend had a history of abuse when the 2011 and 2012 investigations were conducted.

Here, the State's placement decision was harmful to WM. The State should be subject to liability – if WM can prove all the elements of his case – for making that harmful decision. I dissent because the majority wrongfully rules otherwise.

21

The majority opinion also includes a section on proximate cause that is dicta and nothing more than a gratuitous advisory opinion. The majority ignores the fact that this case was decided on summary judgment and therefore all reasonable inferences must be viewed in favor of WM, the nonmoving party. *Sartin v. Estate of McPike*, 15 Wn. App. 2d 163, 172, 475 P.3d 522 (2020), *review denied,* 196 Wn.2d 1046 (2021). The majority states that even if the State had directed WM's mother not to allow Rich to have contact with WM, she would have ignored that directive. But this is an *inference* – no evidence supports that statement. And the majority is viewing that inference in favor of the State. *Viewed in the light most favorable to WM*, a reasonable inference is that WM's mother would have followed such a directive and WM would not have been injured. Therefore, there is a question of fact regarding proximate cause.

_____
MAXA, J.