[No. 66960-5-I.   Division One.   August 15, 2011.]

THE DEPARTMENT OF REVENUE, *Appellant*, v. NORD NORTHWEST CORPORATION, *Respondent*.

218

*Robert M. McKenna, Attorney General*, and *Charles E. Zalesky, Assistant*, for appellant.

*Martin D. Meyer*, for respondent.

¶1 LAU, J. — This case involves a dispute over the assessment of retailing business and occupation (B&O) tax and retail sales tax on amounts received by Nord Northwest

Corporation from constructing two condominiums on real property owned by two limited liability companies (LLCs). The Washington State Board of Tax Appeals (Board) found that Nord owed no tax because it qualified as a "speculative builder" who owes no tax on the value of construction services it performed on real property it owns. WAC 458--20-170(2)(a). The superior court reversed and reinstated the tax assessment determination in an appeal filed by the Department of Revenue (Department). The superior court concluded that Nord did not qualify as a speculative builder because it did not own the real property on which the condominiums were built. We affirm the superior court's judgment and reverse the Board's decision.

## FACTS

¶2 The material facts are not disputed. Around 1998, licensed construction contractor Nord began to explore the feasibility of two condominium construction projects, one in Stanwood, Washington, and one in Bellingham, Washington. On February 8, 1999, Nord entered into a purchase and sale agreement for a Stanwood property owned by Baron Development Group. On April 29, 1999, Nord entered into a purchase and sale agreement with Western Resource Group to purchase a Bellingham property. Nord initially sought financing for the construction projects at its local bank, but the bank required additional equity funding. Sole shareholder and president Richard Nord Sr., vice president Richard Nord Jr., and chief financial officer Ronald Hoelscher decided that Nord could raise the necessary equity by securing additional investors.

¶3 To accomplish this, they formed two LLCs in 1999—Stanwood Condominiums LLC and Bellingham Condominiums LLC—with the stated purpose to own, manage, and develop real estate and to carry on any lawful business or activity. Stanwood Condominiums LLC consisted of five members: Nord, three married couples, and a trust. Nord

contributed services and received an initial 40 percent ownership interest. The three married couples and the trust each contributed $37,500 and each received an initial 15 percent ownership interest. Richard Nord Sr. was named the LLCs' manager.

¶4 Shortly after forming Stanwood Condominiums LLC, the members passed a resolution that provided in part that Nord would receive a fully vested 60 percent ownership interest in Stanwood Condominiums LLC in consideration for Nord's agreement to develop the real property. The resolution also authorized and directed Nord to act as prime contractor for the development and to receive payment from the gross proceeds from unit sales constructed equal to 10 percent of construction costs as Nord's profit.

¶5 On June 11, 1999, Stanwood Condominiums LLC acquired the proposed condominium project real property by statutory warranty deed from Baron Development Group.[1] Stanwood Condominiums LLC later entered into a construction loan agreement with Peoples Bank, which identified Stanwood Condominiums LLC as the borrower and Peoples Bank as the lender. The LLC hired Nord to perform the construction work on the condominium project.

¶6 The transactions leading up to construction of the two condominiums were similar.[2] Nord initially proposed the Bellingham project in late 1998 or early 1999. Bellingham Condominiums LLC was formed in June 1999. The LLC consisted of six members, including Nord. Nord contributed services and received an initial 30 percent ownership interest. Four members contributed $12,500 each and each received an initial 12.5 percent ownership interest. And Western Resource Group received a 20 percent ownership interest.

---

[1] Nord assigned its rights in the property under the purchase and sale agreement to Stanwood Condominiums LLC. *See* Finding of Fact 17.

[2] The main difference between the transactions was that in the case of the Bellingham project, Nord briefly held title prior to construction, while in the case of the Stanwood project, Nord never held title.

¶7 At around the same time that Bellingham Condominiums LLC was formed, Nord acquired real property in Bellingham from Western Resource Group by statutory warranty deed. On September 27, 1999, Nord transferred the real property to Bellingham Condominiums LLC by quitclaim deed. Bellingham Condominiums LLC and Nord both accounted for this real property transfer as a sale with Bellingham Condominiums LLC taking title to the land in exchange for an account payable to Nord. Nord paid no excise tax on the transfer to the LLC, labeling it a "mere change in identity." Administrative Record (AR) at 343.

¶8 On September 22, 1999, the Bellingham Condominiums LLC members passed a resolution that provided in part that Nord receive a fully vested 60 percent "ownership economic interest" in Bellingham Condominium LLC in consideration for Nord's agreement to develop the real property. The resolution also authorized and directed Nord to act as prime contractor for the development and to receive payment from the gross proceeds of unit sales equal to 10 percent of construction costs as Nord's profit.

¶9 Shortly after Bellingham Condominiums LLC was formed, it obtained construction loans from InterWest Bank and Horizon Bank. Both loan agreements identified Bellingham Condominiums LLC as the borrower and the bank as the lender.

¶10 According to the LLC resolutions, Nord performed the construction work on the Bellingham and Stanwood condominium projects. Nord entered into construction contracts with the LLCs, and the LLCs paid Nord for its construction services. *See, e.g.*, AR at 669 (American Institute of Architects construction contract between Nord and Stanwood Condominiums LLC), 812-17 (bills from Nord to Bellingham Condominiums LLC for construction services). The LLCs later entered into purchase and sale contracts with the eventual condominium purchasers, with the LLCs listed as sellers and the individual buyers as purchasers. *See, e.g.*, AR at 712, 855. Nord treated itself as a speculative

builder under WAC 458-20-170 even though the LLCs held legal title to the real property. As a result, Nord paid no retailing B&O tax and neither charged nor collected retail sales tax on the construction services it rendered to Bellingham Condominiums LLC or Stanwood Condominiums LLC.

¶11 In 2003, the Department of Revenue audited Nord for the January 1998 through February 2002 reporting periods, which resulted in a November 12, 2003 notice of tax assessment. The two primary audit adjustments made to Nord's excise tax returns reclassified the Stanwood and Bellingham projects as retail construction. Nord appealed from the tax assessment. On April 30, 2008, the Department of Revenue issued its final executive level determination denying Nord's appeal and affirming the tax assessment. Nord appealed to the Board of Tax Appeals. After a formal hearing under the Administrative Procedure Act, chapter 34.05 RCW, the Board issued its decision in favor of Nord. Although Richard Nord Sr. conceded in closing argument[3] that "[Nord] knew we didn't own the property," the Board concluded that Nord was a speculative builder on the Stanwood and Bellingham condominium projects either because Nord satisfied the attributes of ownership set out in WAC 458-20-170 or because Nord held a beneficial interest in the real property under the resulting trust doctrine.

¶12 The Department petitioned for judicial review of the final decision of the Board of Tax Appeals. On February 12, 2010, the Thurston County Superior Court issued a letter opinion reversing the Board's decision. The court found that Nord did not qualify as a speculative builder as a matter of law because the undisputed evidence showed that Nord did not own the real property on which it constructed the condominiums. Nord appeals, but because the State suf-

---

[3] Richard Nord Sr., a nonattorney, represented Nord Northwest Corporation at the Board of Tax Appeals. Counsel represented Nord Northwest Corporation before the Thurston County Superior Court and this court.

fered the adverse agency action, the State is designated as the appellant.[4]

*Standard of Review*

¶13 "Proceedings before the Board of Tax Appeals are governed by the Administrative Procedure Act." *Stuewe v. Dep't of Revenue*, 98 Wn. App. 947, 949, 991 P.2d 634 (2000). "The burden of demonstrating the invalidity of agency action is on the party asserting invalidity." RCW 34.05.570(1)(a).

¶14 "RCW 34.05.570(3) contains the standards of review this court applies to the Board record. Conclusions of law are reviewed de novo under an error of law standard." *Stuewe*, 98 Wn. App. at 949 (footnote omitted). "However, under this standard, we accord substantial weight to an agency's interpretation of a statute within its expertise, and to an agency's interpretation of rules that the agency promulgated." *Verizon Nw., Inc. v. Emp't Sec. Dep't*, 164 Wn.2d 909, 915, 194 P.3d 255 (2008) (citations omitted). This court will also grant relief if "[t]he order is not supported by evidence that is substantial when viewed in light of the whole record before the court, which includes the agency record for judicial review, supplemented by any additional evidence received by the court under this chapter." RCW 34.05.570(3)(e). Because this court sits in the same position as the superior court, we give no deference to the superior court's rulings. *Verizon*, 164 Wn.2d at 915.

## ANALYSIS

*Interpretation of WAC 458-20-170(2)*

¶15 Nord argued before the Board (and here) that it qualified as a speculative builder and was therefore en-

---

[4] *City of Federal Way v. Town & Country Real Estate LLC*, 161 Wn. App. 17, 23 n.4, 252 P.3d 382 (2011) (citing General Order 2010-1 of Division II, *In Re: Modified Procedures For Appeals Under The Administrative Procedures Act, Chapter 34.05, and Appeals Under the Land Use Petition Act, Chapter 36.70C RCW* (Wash. Ct. App. Mar. 23, 2010)).

titled to the tax advantage[5] afforded to such an entity. Nord relies on the second sentence in WAC 458-20-170(2)(a), which sets out four nonexclusive "attributes of ownership" required for such preferential tax treatment.

¶16 The State counters that Nord's argument ignores the first sentence in WAC 458-20-170(2)(a), which requires ownership to enable classification as a speculative builder. The State maintains that simply because the second sentence requires certain attributes of ownership, this requirement does not substitute for actual ownership of the property as required by the first sentence. And the State argues that because it is undisputed that the LLCs, not Nord, owned the real property, it is unnecessary to address the nonexclusive attributes of ownership factors. The State also relies on subsection (2)(f), which provides that corporations performing construction on land held by "corporate officers, shareholders, partners, owners, co-venturers, etc." are not taxed as speculative builders. The State further argues that even if the attributes of ownership factors apply here, substantial evidence fails to support the Board's conclusion that Nord met those factors.

¶17 We first address the statutory scheme under which the Department of Revenue promulgated the rule at issue here. The State of Washington imposes a tax on retail sales in the state. RCW 82.08.020(1). There is also a B&O tax levied for the act or privilege of engaging in business activities such as retail sales. RCW 82.04.220. A "retail sale" includes services rendered in constructing homes for consumers. RCW 82.04.050(2). A builder that constructs a house on real property of or for *consumers* (1) is engaged in making a "retail sale," (2) must pay retail B&O tax, and (3) must collect and remit retail sales tax on the gross amount of the

---

[5] For clarity, we use the same term as the State to describe the tax benefits enjoyed by a construction contractor that qualifies as a speculative builder.

sale. RCW 82.04.050(2)(b); RCW 82.08.020(1); WAC 458-20-
-170. Such a builder is a "prime contractor" under WAC
458-20-170(1)(a). But a builder that constructs a house on
land that it *owns* (1) is not engaged in a "retail sale," (2) is a
"speculative builder" under WAC 458-20-170(2)(a), and (3) is
not required to pay B&O tax or collect or pay retail sales tax
on the value of his or her construction services. *See* WAC
458-20-170; *see also Rigby v. State*, 49 Wn.2d 707, 710, 306
P.2d 216 (1957) (where builder had merely entered earnest
money agreements with purchasers that gave purchasers no
right to immediate possession of the land, purchasers owed
no retail sales tax for period while houses were being
constructed). In sum, speculative builders receive a tax
advantage from the state.

¶18 The core issue here is whether Nord satisfied
WAC 458-20-170's owner requirement when it constructed
the Bellingham and Stanwood condominium projects. "As in
statutory interpretation, where a regulation is clear and
unambiguous, words in a regulation are given their plain
and ordinary meaning unless a contrary intent appears."
*Silverstreak, Inc. v. Dep't of Labor & Indus.*, 159 Wn.2d 868,
881, 154 P.3d 891 (2007) (plurality opinion). "A term in a
regulation should not be read in isolation but rather within
the context of the regulatory and statutory scheme as a
whole." *City of Seattle v. Allison*, 148 Wn.2d 75, 81-82, 59
P.3d 85 (2002).

¶19 The distinction between a prime contractor
and a speculative builder turns on whether the person
performing the construction owns the real property on
which the construction is performed. In this case, no dispute
exists that the LLCs, not Nord, held legal title to the real
property on which the Stanwood and Bellingham condo-
miniums were built. In addition, it is undisputed that (1)
the LLCs held legal title to the properties throughout
construction; (2) the LLCs' governing documents state that
the companies' business shall be to "own, manage, sell,
and/or develop" real estate; (3) Nord, as a construction

contractor, entered into construction contracts with the LLCs and billed the LLCs for its constructions services, and the LLCs paid Nord for these services; (4) the LLCs entered into construction loans with banks to finance the construction, and those documents show the LLCs as borrowers; and (5) the LLCs entered into purchase and sale contracts with the eventual condominium unit buyers. And in closing remarks to the Board, Richard Nord Sr. conceded, "I understand that we've got to get beyond the fact that we didn't own the property. [Nord] knew we didn't own the property. We admit we don't own the property." Recorded Proceedings Transcript (Dec. 16, 2008) (RPT) at 214.

¶20 The parties agree that WAC 458-20-170(2)(a) sets forth the requirements for property ownership:

> As used herein the term "speculative builder" means one who constructs buildings for sale or rental upon real estate owned by him. The attributes of ownership of real estate for purposes of this rule include but are not limited to the following: (i) The intentions of the parties in the transaction under which the land was acquired; (ii) the person who paid for the land; (iii) the person who paid for improvements to the land; (iv) the manner in which all parties, including financiers, dealt with the land. The terms "sells" or "contracts to sell" include any agreement whereby an immediate right to possession or title to the property vests in the purchaser.

¶21 Despite the overwhelming undisputed evidence of ownership discussed above, Nord nevertheless contends, and the Board found, that it qualified as a speculative builder because it satisfied the attributes of ownership requirements under WAC 458-20-170(2)(a). We conclude the Board erred when it interpreted and applied the attributes of ownership in the face of overwhelming undisputed evidence of who owned the real property—the LLCs.

¶22 WAC 458-20-170(2)(a)'s first sentence defines a "speculative builder" as "one who constructs buildings for sale or rental upon real estate owned by [the builder]." The second sentence lists four nonexclusive attributes of own-

ership. The second sentence's purpose is not to create an exception to the ownership requirement. Rather, the rule ensures that any claim of ownership of real property is genuine when ownership is disputed. The attributes of ownership provision recognizes that a formal transfer of title to real property may not be enough to show ownership of property where the substance of the transaction indicates that the real property was transferred for some other purpose. This becomes clear when WAC 458-20-170(2)(a) is read in context with subsection (b):

> Where an owner of real estate sells it to a builder who constructs, repairs, decorates, or improves new or existing buildings or other structures thereon, and the builder thereafter resells the improved property back to the owner, the builder will not be considered a speculative builder. In such a case that portion of the resale attributable to the construction, repairs, decorations, or improvements by the builder, shall not be considered a sale of real estate and shall be fully subject to retailing business and occupation tax and retail sales tax. *It is intended by this provision to prevent the avoidance of tax liability on construction labor and services by utilizing the mechanism of real property transfers.*

WAC 458-20-170(2)(b) (emphasis added).

¶23 WAC 458-20-170(2)(a) and (b) reflect Washington real property law and the statutory and regulatory scheme here. Under Washington law, a real property title transfer does not always establish property ownership. Instead, a deed accompanied by an agreement that it shall be canceled or the land reconveyed upon a debt's repayment is a mortgage. *Bank of Am., NA v. Prestance Corp.*, 160 Wn.2d 560, 562 n.1, 160 P.3d 17 (2007). As a result, when a construction contractor takes title to real property prior to construction on that property, the Department looks beyond the deed's face to determine whether the contractor actually received property ownership or merely a security interest. Because a deed might not convey ownership, the Department looks to certain attributes of ownership to

determine whether the person with title to the real property is the true owner. The Department's position on this point was first discussed in former Excise Tax Bulletin 275, issued in September 1966. That bulletin explained, "Deeds, though absolute on their face, may be mortgages, depending upon the surrounding circumstances." AR at 569. Accordingly, a landowner who deeds a lot to a construction contractor to secure financing for the project remains the real property owner. Under this example, the construction contractor holds a mortgage interest.

¶24 Neither the language nor the purpose of WAC 458--20-170(2) creates an exception to the requirement that the builder must be the bona fide owner of the real property to qualify as a speculative builder. Rather the attributes of ownership factors listed in WAC 458-20-170(2)(a) are relevant considerations only when necessary to distinguish actual ownership from a mortgage or similar security interest. Applying the attributes of ownership here is inconsistent with WAC 458-20-170(2)(b) and Washington real property law.

¶25 And as the Department correctly notes, it cannot use administrative rules to expand tax immunity beyond the exemptions provided by statute or required by the state and federal constitutions.[6] *See Coast Pac. Trading, Inc. v. Dep't of Revenue*, 105 Wn.2d 912, 917, 719 P.2d 541 (1986). When the legislature wanted to set forth exemptions, deductions, and credits from the retail sale tax, it did so explicitly. *See* RCW 82.04.310-.4494.

---

[6] Nord relies on a construction tax guide issued by the Department that states, "The owner of real property is generally the holder of the recorded title. However it is possible for a person to hold title to real property which he/she does not own. Therefore, attributes of ownership other than mere title to the property may determine the tax application." AR at 590. This guide lends no support to Nord's position and is consistent the Department's position. The guide makes the same point as WAC 458-20-170(2)—that sometimes ownership alone is not enough to qualify as a speculative builder—one must also exercise the attributes of ownership.

¶26 "While 'the ultimate authority' for determining a statute's meaning remains with the court, considerable deference will be given to the interpretation made by the agency charged with enforcing the statute." *S. Martinelli & Co. v. Dep't of Revenue*, 80 Wn. App. 930, 937, 912 P.2d 521 (1996) (quoting *Impecoven v. Dep't of Revenue*, 120 Wn.2d 357, 363, 841 P.2d 752 (1992)). And "[o]ur paramount concern is to ensure that the regulation is interpreted in a manner that is consistent with the underlying policy of the statute." *Overlake Hosp. Ass'n v. Dep't of Health*, 170 Wn.2d 43, 52, 239 P.3d 1095 (2010). The Department's interpretation also accords with the legislative intent of the B&O tax, the other tax benefit retained by speculative builders. *See Impecoven*, 120 Wn.2d at 363 ("the legislative purpose behind the B&O tax scheme is to tax virtually all business activity in the state"). Because the Department's interpretation harmonizes the statutory and regulatory scheme, we agree with the Department's interpretation of the rule it enforces and conclude WAC 458-20-170(2) unambiguously requires real property ownership to qualify as a speculative builder.

¶27 Notably, the Board concluded in its final decision, "In light of WAC 458-20-170(2)(a), WAC 458-20-170(f) [sic] does not apply to the facts of this case." AR at 24. Rule 458-20-170(2)(f) states:

> Persons, including corporations, partnerships, sole proprietorships, and joint ventures, among others, who perform construction upon land owned by their corporate officers, shareholders, partners, owners, co-venturers, etc., are constructing upon land owned by others and are taxable as sellers under this rule, not as "speculative builders."

The Board gave no rationale for this conclusion. And Nord provides no argument on this point. In this case, Nord was a member of two LLCs and performed construction services on real property owned by those LLCs. Nord Northwest Corporation "perform[ed] construction upon land owned by [its] co-venturers, etc." and was therefore "constructing upon land owned by others and [is] taxable as [a seller]

under this rule, not as [a] 'speculative builder[ ].' " WAC 458-20-170(2)(f). Under WAC 458-20-170(2), Nord is a separate entity from the LLCs even though Nord held an ownership interest in both LLCs.

¶28 This rule is consistent with Washington law which treats an owner of a business entity as a separate person from the entity itself. *See* RCW 25.15.070(2)(c) (LLC is a separate legal entity from its owners); *see also Wash. Sav-Mor Oil Co. v. State Tax Comm'n*, 58 Wn.2d 518, 520-23, 364 P.2d 440 (1961) (Plaintiff challenged the assessment of B&O tax on sales to its parent corporation, arguing that as a wholly owned subsidiary, it was actually a part of the parent company and could not make a sale to itself. Our Supreme Court rejected the argument, reasoning, "The appellant asks us to disregard its separate existence . . . in order to gain an advantage. This we cannot do. The legislature has not seen fit to exclude transactions between affiliated corporations, and we find in the facts of this case nothing which would justify the judicial engrafting of such an exclusion upon the statute.").

¶29 It is well settled that a parent and subsidiary are for legal purposes generally treated as separate entities. In sum, WAC 458-20-170(2)(f) sets out the well established legal principle that a business entity is a distinct, separate "person" from its owners. Here, no dispute exists that the LLCs owned the properties. Therefore, Nord fails to qualify as a "speculative builder" under WAC 458-20-170(2)(f).

¶30 The record fails to show why the Board found that subsection (2)(f) did not apply in this case when it must read and construe this administrative rule "as a whole, giving effect to all the language and harmonizing all provisions." *Cannon v. Dep't of Licensing*, 147 Wn.2d 41, 57, 50 P.3d 627 (2002); *see* AR at 19. For the Board to conclude here without explanation that subsection (2)(a) applied and subsection (2)(f) did not is an erroneous interpretation and application of the rule and violates well established rules of construction. We conclude the Board's failure to apply WAC

458-20-170(2)(f) here constitutes an erroneous interpretation of the rule and overwhelming undisputed evidence demonstrates Nord performed construction services on real property it did not own. Therefore, the Board's contrary finding is erroneous as a matter of law.

*Attributes of Ownership*

¶31 But even if we applied the attributes of ownership factors, Nord's ownership claim fails. The State argues that even under the attributes of ownership factors, the Board erred because insufficient evidence exists to support its conclusion that Nord qualified as an owner. Nord responds that substantial evidence supports the Board's conclusion. This court reviews the evidence to determine whether "[t]he order is not supported by evidence that is substantial when viewed in light of the whole record before the court . . . ." RCW 34.05.570(3)(e).

¶32 The attributes of ownership consist of four, non-exclusive factors: (1) the intentions of the parties in the transaction under which the land was acquired; (2) the person who paid for the land; (3) the person who paid for improvements to the land; and (4) the manner in which all parties, including financiers, dealt with the land. WAC 458-20-170(2)(a).

¶33 Nord relies on the following evidence to support attributes of ownership: (1) testimony by its chief financial officer Ron Hoelscher that "the LLC's were just a financing vehicle to get the equity required so that we could get financing from lending institutions"; (2) Nord's extensive control over the condominium construction; (3) the LLCs held no meetings; (4) Nord paid for the land in both projects; (5) Nord and Richard Nord Sr. guaranteed the loans; (6) the banks loaned money based on Nord's reputation and control of the projects; and (7) Nord paid the insurance on the projects, marketed the properties, and provided warranties to the condominium purchasers. RPT at 24.

¶34 In considering the attributes of ownership factors, the Board relied principally on a premise raised by neither

party—the cash contributions by the non-Nord LLC members were "loans" and the LLCs were merely a vehicle to secure those loans. *See* Findings of Fact 4, 8, 10-13, 20, 28. The State challenges the Board's loan determination and the corresponding findings of fact on this point. Nord makes no contrary argument or direct challenge to this assignment of error.

¶35 A capital contribution is not a loan. *Saviano v Westport Amusements, Inc.*, 144 Wn. App. 72, 81, 180 P.3d 874 (2008). "A contribution to the capital of a partnership by a member does not constitute a loan to his or her copartner." 68 C.J.S. *Partnership* § 126 (2009). "The contribution of a member to a limited liability company may be made in cash, property or services rendered, or a promissory note or other obligation to contribute cash or property or to perform services." RCW 25.15.190.

¶36 Our review of the record shows no promissory note or loan document to establish that LLC members' cash contributions constituted a loan to Nord. Notably, Nord never presented any evidence or argument to the Board that cash contributions constituted loans to Nord. The record evidence here plainly establishes LLC members made cash contributions, not loans to Nord.[7] For example, the Stanwood Condominium LLC federal partnership tax returns designate the amounts contributed by the minority members as capital contributions rather than loans. The documents contained in the agency record fail to support the Board's findings on this point.

¶37 Nor does the testimony presented by Nord at the administrative hearing support the Board's findings. Ronald Hoelscher, Nord's chief financial officer, an accountant, and an LLC minority member, explained that while Nord and Richard Nord Sr. controlled the LLCs and made all decisions relating to the business operations of the LLCs,

---

[7] We have searched the record and find no support for the Board's unilateral determination that members made loans to Nord.

the minority members were "equity" investors in those LLCs. RPT at 27. Specifically, Hoelscher testified:

> The investors would provide $200,000 in equity in the form of cash and then Nord would provide the balance of the equity required. . . . For providing the equity[,] investors would receive a percentage of the profits. So we were trying to . . . separate this project . . . and we did it using this LLC, but it was only to secure the equity funding and to provide the equity holders a participation in the overall project as it was finished.

RPT at 27. Richard Nord Sr. also testified that the LLCs' purpose was to bring in additional equity investors to meet the loan-to-value requirements of the banks. Nord witness Mike Cunningham testified that raising additional equity capital is a legitimate business reason for forming an LLC. Accordingly, we agree with the State that no substantial evidence exists to support the finding that the LLC members loaned cash to Nord.

¶38 And even if we assume the LLCs held title to the properties merely as security for the investors, this fact fails to support the conclusion that Nord, rather than the LLCs, owned the real property. It is undisputed that the LLC members held no mortgage or other security agreement with respect to the properties. Therefore, any "security" that the investors had existed through their ownership shares of the LLC, which in turn owned the properties. This further supports the conclusion that the LLCs, not Nord, owned the real property.

¶39 Although the record supports Nord's contention that its officers were aware of WAC 458-20-170(2) and sought speculative builder tax advantage, the overwhelming, objective evidence fails to support Nord's contention that the parties intended Nord to own the properties. And as discussed above, it is undisputed that the LLCs held title throughout construction, borrowed money from banks to pay for the construction, paid Nord for its construction services, and sold the condominium units to the eventual purchasers. While the parties clearly intended Nord to

control the development project and sought tax advantages, the record indicates they intended the LLCs, as separate entities, to own the properties.

¶40 Based on the reasons discussed above, we conclude the Board erred as a matter of law in determining Nord qualified as a speculative builder and erroneously interpreted and applied the attributes of ownership under WAC 458-20-170(2)(a).

## Resulting Trust

¶41 The State also argues that the Board erred by improperly expanding the "speculative builders" classification beyond the limits provided by the law.[8] Nord counters, "There was absolutely no intent by [Nord] that either LLC would take beneficial ownership of the land when the properties were transferred into the LLC's." Resp't's Br. at 13.

¶42 For the reasons discussed above, the record fails to establish by clear, cogent, and convincing evidence that Nord was entitled to receive the beneficial interest in the real property. But even if we assume sufficient evidence exists, holding a beneficial interest is not equivalent to ownership under the relevant tax laws. The tax statutes and regulations discussed above exempt a contractor from certain taxes only if the contractor owns the land it builds on. So even if Nord held a beneficial interest in the real property, it did not "own" the land under the plain meaning of the applicable tax laws. Accordingly, the Board erred in concluding that a resulting trust qualified Nord as a speculative builder.

---

[8] A resulting trust arises when a person conveys a property's legal title to another under circumstances that reasonably show the person did not intend for the grantee to hold a beneficial interest in the property. *Thor v. McDearmid*, 63 Wn. App. 193, 205, 817 P.2d 1380 (1991). Evidence proving a resulting trust must be clear, cogent, and convincing. *In re Estate of Spadoni*, 71 Wn.2d 820, 823, 430 P.2d 965 (1967). This standard is not met if the evidence supports some other hypothesis or "does not unmistakably point to the existence of the claimed trust." *Engel v. Breske*, 37 Wn. App. 526, 530-31, 681 P.2d 263 (1984).

## CONCLUSION

¶43 Because Stanwood Condominiums LLC and Bellingham Condominiums LLC owned the real property developed by Nord Northwest Corporation, the Board of Tax Appeals erred as a matter of law and fact by concluding that Nord was a speculative builder under WAC 458-20-170. We affirm the superior court's judgment and reverse the final decision of the Board of Tax Appeals.

DWYER, C.J., and APPELWICK, J., concur.

Reconsideration denied September 8, 2011.

Review denied at 173 Wn.2d 1019 (2012).