**NOTICE:   SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

Filed
Washington State
Court of Appeals
Division Two

March 21, 2023

**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

**DIVISION II**

| | |
|---|---|
| LANZCE G. DOUGLASS, INC., | No. 57108-1-II |
| Appellant, | |
| v. | |
| STATE OF WASHINGTON, DEPARTMENT OF REVENUE, | PUBLISHED OPINION |
| Respondent. | |

GLASGOW, C.J.—In 2003, Lanzce G. Douglass, Inc. purchased property in Spokane. In 2004, Douglass conveyed the property via a quitclaim deed to Summerhill, LLC. Douglass is the sole member of Summerhill. At the same time, Douglass and Summerhill entered into a purchase and sale agreement that allowed Douglass to possess the land in the meantime and to repurchase lots on the property for $10 dollars per lot.

Douglass constructed houses on the property while Summerhill held legal title to the property. From 2014 to 2017, Douglass treated itself as a speculative builder with respect to the construction and sale of houses on the property. In Washington, speculative builders receive a tax advantage over prime contractors. After an audit, the Department of Revenue issued an assessment against Douglass, finding that because Douglass did not hold title to the property, Douglass was a prime contractor, rather than a speculative builder.

Douglass paid the tax owed and then challenged the Department's determination in superior court, seeking a tax refund. Both parties agreed there were no issues of fact. The superior court granted summary judgment for the Department, ruling that Douglass was a prime contractor.

No. 57108-1-II

Douglass appeals, arguing that it is a speculative builder. Douglass contends that it held a substantial ownership interest in the property, while Summerhill held a mere security interest in the property. The Department contends that Summerhill retained title to the land and Douglass did not own the property during construction.

We affirm.

## FACTS

### I. BACKGROUND

In 2003, Douglass purchased property in Spokane, with funding from a third-party lender. In 2004, Douglass quitclaimed the property to Summerhill. Douglass is Summerhill's sole member. Lanzce G. Douglass,[1] the owner of Douglass, believed that conveying the property to Summerhill "provided some liability protection." Clerk's Papers (CP) at 29. According to Lanzce, Summerhill "did not pay [Douglass] for the property, assume any liability with respect to the property, or hold any separate funds or accounts of its own." CP at 27. Douglass continued to pay property taxes and "all other incidental expenses[] associated with the Summerhill property." *Id.*

On the same day the property was quitclaimed to Summerhill, Douglass and Summerhill entered into a purchase and sale agreement with an earnest money provision. Douglass paid $10 dollars in earnest money to secure the right to repurchase the property, and the agreement allowed Douglass to repurchase lots "on an individual basis" for "$10 per lot." CP at 44. Under the terms of the agreement, Douglass had an immediate right to possession of the property upon acceptance of the terms of the purchase and sale agreement. The parties agreed that closing would occur by individual lot and would take place in the future at Douglass's option. Upon closing on each lot,

---

[1] For clarity, we refer to the company Lanzce G. Douglass, Inc. as "Douglass," and the person Lanzce G. Douglass as "Lanzce." Lanzce is the sole owner of Douglass.

2

No. 57108-1-II

Douglass would pay $10 dollars and Summerhill would execute a quitclaim deed transferring the property to Douglass.

Douglass also borrowed money from U.S. Bank to finance its business operations. The property was collateral for the loan and Summerhill was listed as the grantor on the deed of trust securing the loan. The loan was not used to develop the property.

While Summerhill held legal title to the property under the quitclaim deed, Douglass constructed houses on a number of lots. Douglass and Summerhill planned to have Summerhill convey individual lots back to Douglass under the terms of the purchase and sale agreement after houses were constructed and before they were sold to third-party home buyers. From 2014 to 2017, they sold 23 homes and lots accordingly.

## II. TAXATION OF CONSTRUCTION

In Washington, retail sales are taxed. RCW 82.08.020(1). "A 'retail sale' includes services rendered in constructing homes for consumers." *Dep't of Revenue v. Nord Nw. Corp.*, 164 Wn. App. 215, 224, 264 P.3d 259 (2011). Those who engage in "business activities," including retail sales, are also subject to a business and occupation (B&O) tax. RCW 82.04.220. The business of selling at retail is taxed at the retailing B&O rate. *See Gartner, Inc. v. Dep't of Revenue*, 11 Wn. App. 2d 765, 774, 455 P.3d 1179 (2020).

Under Department of Revenue regulation, a "prime contractor" is a person who performs construction services on real property "for consumers." WAC 458-20-170(1)(a). Prime contractors are subject to the retailing B&O tax and must charge the person or entity receiving their construction services, the consumer, the retail sales tax on the contract price of the construction or the total cost of construction. WAC 458-20-170(3)(a), (4)(a). If the buyer fails to do so, the prime contractor as the seller is liable for the amount of the tax. RCW 82.08.050.

3

No. 57108-1-II

A "speculative builder" is one "who constructs buildings for sale or rental upon real estate" they own. WAC 458-20-170(2)(a). Speculative builders "must pay sales tax upon all materials purchased by them and on all charges made by their subcontractors." WAC 458-20-170(2)(e). Speculative builders do not have to pay the retailing B&O tax or "collect or pay retail sales tax on the value of [their] construction services." WAC 458-20-170(2)(c).[2] "[S]peculative builders receive a tax advantage from the state." *See Nord*, 164 Wn. App. at 225.

### III. DEPARTMENT OF REVENUE'S ASSESSMENT OF DOUGLASS'S TAXES

From 2014 to 2017, Douglass "reported and paid tax on the real property sales . . . as a speculative builder" under WAC 458-20-170. CP at 117. In 2017, the Department audited Douglass and found that Douglass was a "prime contractor" because it "was building on land owned by another LLC." CP at 94. The Department issued an assessment against Douglass for $254,491, which included retail sales and B&O tax, interest, and late penalties. Douglass appealed to the Department's Administrative Review and Hearings Division, which denied the petition. In 2019, Douglass paid the Department $262,136.36.

### IV. SUMMARY JUDGMENT IN SUPERIOR COURT

In 2020, Douglass sued the Department in superior court, seeking a tax refund and declaratory judgment that it was a speculative builder. Douglass argued that it "retained virtually all of the benefits and burdens of ownership even after legal title was transferred to Summerhill." CP at 4. Douglass additionally claimed it held a "beneficial interest in [the] land" due to the purchase and sale agreement.[3] *Id.*

---

[2] Both parties apply the current versions of the relevant statutes and regulations in this case.

[3] In the alternative, Douglass sought a "refund of sales and use taxes paid on materials purchased in connection with construction and all sales taxes paid with respect to charges imposed by subcontractors." CP at 7. Douglass abandoned this alternate cause of action on appeal.

4

No. 57108-1-II

In 2021, Douglass moved for summary judgment on the question of whether it was a speculative builder. Douglass again argued that it was the owner of the property, claiming that although Summerhill held legal title to the land, Summerhill had less than a "true ownership" interest in the land due to the purchase and sale agreement. CP at 16. Douglass also argued that it was an owner under the "attributes of ownership" set out in WAC 458-20-170(2)(a), which consider: "(i) The intentions of the parties in the transaction under which the land was acquired; (ii) the person who paid for the land; (iii) the person who paid for improvements to the land; (iv) the manner in which all parties, including financiers, dealt with the land."

In response, the Department argued that Douglass was not the owner of the land, and that purchase and sale agreements, unlike real estate contracts, do not grant the purchaser a substantial ownership interest in the property. The Department also contended that the attributes of ownership are inapplicable in this case, but even so, an analysis of the attributes did not support Douglass's claim of ownership.

The superior court noted that there were "no disputes that the legal title to the properties were held in Summerhill at the time" of construction. Verbatim Rep. of Proc. (VRP) at 24. The superior court concluded that Summerhill, and not Douglass, was the legal owner of the property during construction. The superior court granted summary judgment to the Department, finding that Douglass "was not a bona fide owner entitled to treatment as a speculative builder under WAC 458-20-170." CP at 170.

Douglass appeals.

5

No. 57108-1-II

## ANALYSIS

### I. BURDEN AND STANDARD OF REVIEW

Douglass bears the burden of proving "that the tax as paid by the taxpayer is incorrect" under RCW 82.32.180. To determine whether Douglass was incorrectly taxed as a prime contractor, we interpret "the applicable statutes and Department regulations regarding speculative builders." *Bravern Residential, II, LLC v. Dep't of Revenue*, 183 Wn. App. 769, 776, 334 P.3d 1182 (2014). These are "questions of law we review de novo." *Id.*

We review summary judgment orders de novo. *W.M. v. State*, 19 Wn. App. 2d. 608, 621, 498 P.3d 48 (2021). "Summary judgment is appropriate if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." *Id. See also* CR 56(c). Here, both parties agree that there are no disputed issues of fact.

Courts retain the "ultimate responsibility for interpreting a regulation." *State v. Numrich*, 197 Wn.2d 1, 19, 480 P.3d 376 (2021). However, we must give "'considerable deference . . . to the interpretation made by the agency charged with enforcing the [regulation],'" here, the Department. *Bravern*, 183 Wn. App. at 778 (quoting *Nord*, 164 Wn. App. at 229). We look to the plain and ordinary language of the regulation, so long as it is clear and unambiguous, unless contrary intent appears in "'the context of the regulatory and statutory scheme as a whole.'" *Nord*, 164 Wn. App. at 225 (quoting *City of Seattle v. Allison*, 148 Wn.2d 75, 81-82, 59 P.3d 85 (2002)).

Additionally, administrative rules cannot "expand tax immunity beyond the exemptions provided by statute or required by the state and federal constitutions." *Id.* at 229. A tax "applies unless the legislature has expressed a clear intent to provide an exemption." *Bravern*, 183 Wn. App. at 778.

No. 57108-1-II

II. OWNERSHIP

Douglass asks us to conclude that it is a speculative builder as a matter of law. Douglass argues that it "held all of the relevant attributes of ownership with respect to the Summerhill Property, save legal title." Appellant's Br. at 11. In particular, Douglass argues that after entering into the purchase and sale agreement, Douglass held an "ownership interest" in the land, while Summerhill's interest was a mere "lien/mortgage-type security interest." Appellant's Br. at 20-21. Douglass further asserts that it is an owner based on the "attributes of ownership" in WAC 458-20-170(2)(a). Appellant's Br. at 26. We disagree.

A.    WAC 458-20-170

The parties agree that this case turns on whether Douglass was a prime contractor or a speculative builder under WAC 458-20-170 and the cases applying that regulation. A "prime contractor" is a person who performs construction services on real property "for consumers." WAC 458-20-170(1)(a). "Prime contractors are required to collect from consumers the retail sales tax measured by the full contract price." WAC 458-20-170(4)(a). "Where no gross contract price is stated, the measure of sales tax is the total amount of construction costs including any charges for licenses, fees, permits, etc., required for construction and paid by the builder." *Id.* Prime contractors are also taxable under the retailing business and occupation tax rate on the same amount. WAC 458-20-170(3).

A "speculative builder" is one "who constructs buildings for sale or rental upon real estate" they own. WAC 458-20-170(2)(a). Under the regulation:

The attributes of ownership of real estate for purposes of this rule include but are not limited to the following: (i) The intentions of the parties in the transaction under which the land was acquired; (ii) the person who paid for the land; (iii) the person who paid for improvements to the land; (iv) the manner in which all parties, including financiers, dealt with the land. The terms 'sells' or 'contracts to sell'

7

No. 57108-1-II

>include any agreement whereby an immediate right to possession or title to the
>property vests in the purchaser.

*Id.* When a legitimate speculative builder sells real estate, the amount attributable to the construction is not subject to the retail sales tax or retailing business and occupation tax because "the price paid is for the sale of real estate." WAC 458-20-170(2)(c).

In the portion of the regulation addressing speculative builders, the Department took steps to keep taxpayers from using property transfers and corporate structures to avoid tax liability. For example, one subsection provides that where an owner sells real property to a builder who constructs a building thereon, and then the builder sells the property back to the original owner, the portion of the resale attributable to the construction "shall be fully subject to retailing business and occupation tax and retail sales tax." WAC 458-20-170(2)(b). This provision is intended to "prevent the avoidance of tax liability on construction labor and services by utilizing the mechanism of real property transfers." *Id.*

In addition, where a builder performs construction on land that is owned by another related corporate entity, the builder is not a speculative builder:

>Persons, including corporations, partnerships, sole proprietorships, and joint
>ventures, among others, who perform construction upon land owned by their
>corporate officers, shareholders, partners, owners, co-venturers, etc., are
>constructing upon land owned by others and are taxable as sellers under this rule,
>not as 'speculative builders.'

WAC 458-20-170(2)(f).

B.    Cases Interpreting the Regulation

In *Nord*, Division One addressed similar, but not identical, facts. 164 Wn. App. at 218. A construction contractor, Nord, built condominiums in Stanwood and Bellingham on property owned by Stanwood Condominiums LLC and Bellingham Condominiums LLC, respectively. *Id.*

8

at 219-21. Prior to construction, Nord recruited investors and created both LLCs. *Id.* at 219-20. Nord was named a member of Stanwood Condominiums LLC. *Id.* at 219.

Nord initially owned, and subsequently quitclaimed, the Bellingham property to Bellingham Condominiums LLC, also prior to construction. *Id*. at 221. Both Stanwood Condominiums and Bellingham Condominiums decided that Nord's ownership interest in the LLCs that owned the relevant properties would increase to 60 percent in exchange for developing the property. *Id*. at 220-21. As the builder, Nord would also receive a profit in the amount of 10 percent of the construction costs from the proceeds resulting from the sale of the completed condominium units. *Id.* For tax purposes, Nord claimed to be a speculative builder even though the LLCs held title to the real property. *Id.* at 221-22.

Division One held that Nord was not a speculative builder because it was not the bona fide owner of the properties in question, the LLCs were, even though Nord had an ownership interest in the properties. *Id*. at 235. The *Nord* court offered two reasons for this conclusion. Regarding the structure and ownership of the LLCs, the court concluded that under WAC 458-20-170(f), Nord was a "separate entity from the LLCs even though Nord held an ownership interest in both LLCs." *Id*. at 230. Division One concluded that Nord had "'perform[ed] construction upon land owned by [its] co-venturers, etc.' and was therefore 'constructing upon land owned by others.'" *Id*. at 229-30 (alterations in original) (quoting WAC 458-20-170(f)). Nord was, accordingly, a prime contractor. *Id.*

The *Nord* court also recognized that WAC 458-20-170(2)(a) lists four "attributes of ownership" that can be used to "determine whether the person with title to the real property is the true owner." 164 Wn. App. at 224, 226-28. But the court explained that the attributes do not "create[] an exception to the requirement that the builder must be the bona fide owner of the real

9

property to qualify as a speculative builder." *Id.* at 228; *see also id.* at 228 n.6. Rather, these attributes are "relevant considerations *only* when necessary to distinguish actual ownership from a mortgage or similar security interest." *Id.* at 228 (emphasis added). For example, "a landowner who deeds a lot to a construction contractor to secure financing for the project remains the real property owner." *Id.* It is only when the real property serves as security for financing purposes that the attributes of ownership come into play. *Id.* In other words, to be an owner for purposes of WAC 458-20-170, a person or entity *must* hold title, but sometimes title is not enough and the attributes found in WAC 458-20-170 must also be applied. *Id.* at 228 n.6. The attributes do not relieve the builder of the fundamental requirement that it be the bona fide owner of the property before it can be a speculative builder. *Id* at 228.

The *Nord* court went on to conclude that even if the attributes of ownership applied, Nord still was not an owner of the property or a speculative builder. Although the intent behind creating the LLCs was to finance the project, the other members of the LLCs made capital contributions, not loans, to Nord. *Id.* at 232-34. It was "undisputed that the LLCs held title throughout construction, borrowed money from banks to pay for the construction, paid Nord for its construction services, and sold the condominium units to the eventual purchasers. While the parties clearly intended Nord to control the development project and sought tax advantages, the record indicate[d] they intended the LLCs, as separate entities, to own the properties." *Id.* at 233-34. Thus, even had the attributes been relevant to the determination of ownership, Nord did not own the properties during construction.

In a later case, we applied WAC 458-20-170(f) to determine an adjacent issue: whether the construction activity of an LLC member was attributable to its parent company. *Bravern*, 183 Wn. App. at 779-80. Bravern LLC had two members, including PCL, "a real estate construction

10

company." *Id.* at 773. Under Bravern's operating agreement, PCL performed construction "on land Bravern owned." *Id.* Bravern sought tax treatment as a "speculative builder," "arguing that because PCL was a member of Bravern, Bravern had constructed . . . on its own land." *Id.* at 775. "[B]ased on the principle . . . that the owners of an LLC are separate from the LLC entity," and the language in WAC 458-20-170(f), we held that "Bravern was not a speculative builder because its member PCL was constructing on property Bravern owned." *Id.* at 779-80. PCL operated as a "separate entity." *Id.* at 778. Relying on *Nord*, the *Bravern* court emphasized that Bravern and PCL were separate entities even though PCL was a member of Bravern.

In sum, to establish that it was a speculative builder, Douglass needs to show that it was the owner of the property during construction. WAC 458-20-170(2)(a). Under *Nord*, *Bravern*, and WAC 458-20-170(2)(f), we analyze Douglass and Summerhill's corporate structure. And under WAC 458-20-170(2)(a) and *Nord*, we also look to the purchase and sale agreement to determine whether it granted Summerhill a security interest. *Nord*, 164 Wn. App. at 228. Under *Nord*, only if the purchase and sale agreement created a security interest do we apply WAC 458-20-170's attributes of ownership factors.

C.    Title Ownership of the Property During Construction

The Department argues that Douglass "seeks to disregard the fact that it conveyed its interests to a separate entity for the benefits that such an arrangement provided, and still take advantage of tax benefits as if it had never made a conveyance." Resp't's Br. at 17. Douglass says that it is "not trying to walk back past a business decision." Appellant's Reply Br. at 2. We agree with the Department.

Both Division One and our court emphasized in *Nord* and *Bravern*, respectively, that we should not ignore the corporate structure chosen by the parties. *See also Wash. Sav-Mor Oil Co. v.*

No. 57108-1-II

*Tax Comm'n*, 58 Wn.2d 518, 520-23, 364 P.2d 440 (1961). Douglass executed a quitclaim deed transferring all aspects of ownership to Summerhill, and Summerhill recorded the deed, holding itself out to the public as owner of the real property. CP at 38-39. *See also Newport Yacht Basin Ass'n of Condo. Owners v. Supreme Nw., Inc.*, 168 Wn. App. 56, 67, 277 P.3d 18 (2012). Summerhill, not Douglass, had title ownership of the relevant land during construction. Douglass had a controlling, 100 percent interest in Summerhill as the sole member. But, as demonstrated by *Nord* and *Bravern*, Douglass's interest does not circumvent the fact that Summerhill and Douglass are separate legal entities. Just as Nord conveyed the Bellingham property to Bellingham Condominiums LLC before construction, Douglass quitclaimed the property to Summerhill, conveying title. Summerhill held legal title to the property as a separate entity while Douglass performed construction. Applying WAC 458-120-170(2)(f) as the *Bravern* and *Nord* courts did, Douglass built on land that it did not own. Instead, Douglass built on property that Summerhill owned, making Douglass a prime contractor.

This conclusion is consistent with the stated purpose and broader context of the regulation. In WAC 458-120-170(2)(b), the Department expressed intent to avoid allowing tax loopholes to be created by real property transfers between owners and construction contractors. WAC 458-20-170(2)(b) contemplates a slightly different situation in which an owner sells to a builder and buys the property back after construction is complete. However, the Department explained it was trying to avoid a situation in which taxpayers avoid liability with property transfer schemes. In this case, the builder, Douglass, first quitclaimed the property to Summerhill, the title holder. Douglass then constructed on the property while Summerhill was the owner. Douglass finally bought the property back after construction. Douglass's motivation in creating Summerhill and transferring the real

12

property was to ensure "liability protection."[4] CP at 29. Allowing Douglass to obtain the benefits of its property transfer but avoid the tax consequences would undermine the intent behind the regulation.

D.        The Purchase and Sale Agreement

Douglass argues that despite the fact that it quitclaimed the property to Summerhill, due to the purchase and sale agreement, Douglass had a "'beneficial interest and real ownership in the land'" during construction. Appellant's Br. at 19 (quoting *Comm. of Protesting Citizens v. Val Vue Sewer Dist.*, 14 Wn. App. 838, 842, 545 P.2d 42 (1976)). Douglass contends that "a purchaser under a real estate contract has substantial rights with respect to the property," such as "possession and control of the property" and the right to "sue for trespass, and . . . to enjoin construction." Appellant's Br. at 18. Douglass suggests that in contrast, Summerhill's interest was a "limited" security interest, "something other (and less) than true ownership." Appellant's Br. at 17. We disagree.

It is true that in a real estate contract, the seller retains the legal title to the property "as security for payment of the purchase price." RCW 61.30.010(1); *see also Tomlinson v. Clarke*, 118 Wn.2d 498, 504, 825 P.2d 706 (1992). Despite the seller retaining title, the purchaser holds "substantial rights in the land," including the right to possess and control the land, although that does not amount to a "fee title." *Bays v. Haven*, 55 Wn. App. 324, 327, 777 P.2d 562 (1989). The "purchaser under an executory real estate contract . . . is clearly the beneficial owner of the real

---

[4] Douglass does not provide clarification on how exactly it planned to limit its liability using Summerhill. Lanzce states that he later "learned that this arrangement did not offer much in the way of liability protection, because any person who obtained a judgment against [Douglass] would be able to seize [Douglass's] interest in Summerhill . . . in satisfaction of any judgment." CP at 29.

No. 57108-1-II

property." *Bays*, 55 Wn. App. at 328. Legal title passes to the purchaser when "the contract price is paid in full." *Tomlinson*, 118 Wn.2d at 504.

A real estate contract is distinct from a purchase and sale agreement, also known as an earnest money agreement. *See* RCW 61.30.010(1); *Geonerco, Inc. v. Grand Ridge Props. IV, LLC*, 146 Wn. App. 459, 465, 191 P.3d 76 (2008). RCW 61.30.010(1) provides that in a real estate contract, "legal title to the property is retained by the seller as [a] security." In contrast, a purchase and sale (or earnest money) agreement does not itself convey title but is a "promise[] to convey title in the future." *Geonerco*, 146 Wn. App. at 465. RCW 61.30.010(1) distinguishes between the two, reciting that a "real estate contract does not include earnest money agreements."

Purchasers in purchase and sale agreements have limited rights. Purchase and sale and earnest money agreements generally "give no *right of possession* to either land or houses until the transactions *are closed*," which occurs when the deed is delivered. *Rigby v. State*, 49 Wn.2d 707, 710, 306 P.2d 216 (1957). Douglass distinguishes *Rigby*, arguing that whereas the agreement in Rigby "did not convey a right to possession until closing," Douglass and Summerhill's purchase agreement allowed Douglass to possess the land immediately. Appellant's Reply Br. at 8-9. In support of this proposition, Douglass points to a provision in the purchase and sale agreement stating Douglass would be entitled to "'physical possession of the [p]roperty upon acceptance of offer.'" Appellant's Br. at 5 (emphasis omitted). The Department agrees that Douglass had a right to occupy the property after the purchase and sale agreement was executed.

Even though Douglass could occupy the property when it was performing construction, Douglass would receive title for each lot after paying only $10. "Closing" was defined, in the purchase agreement, as occurring "prior to any lot being transferred to any third party." CP at 44.

14

No. 57108-1-II

We conclude that the purchase and sale agreement in the record did not give Douglass ownership of the property. Douglass and Summerhill used a standard form to enter into a purchase and sale agreement with an earnest money provision, rather than a real estate contract, so Summerhill retained title ownership of the property during construction. CP at 41-44. Even if Douglass was entitled to physical possession as soon as the purchase and sale agreement was signed, during construction, Summerhill still held legal title. The purchase and sale agreement did not establish that Douglass could exercise other legal rights of ownership, like the rights to exclude, alienate, or otherwise control. *See, e.g.*, *Pope Res., LP v. Wash. State Dep't of Nat. Res*., 197 Wn. App. 409, 419, 389 P.3d 699 (2016) (listing some benefits of property ownership) *rev'd on other grounds,* 190 Wn.2d 744, 418 P.3d 90 (2018).

When Douglass paid $10 for each lot after construction, Summerhill conveyed the title for each lot to Douglass, at which point Douglass acquired ownership. *See* CP at 44. Douglass believes that the purchase and sale agreement was not an earnest money agreement because it did not include "any contingencies other than a nominal payment." Appellant's Reply Br. at 7. Douglass could receive title "[a]t any time . . . upon mere payment of the $10/lot." Appellant's Reply Br. at 9-10. However, the purchase and sale agreement did not establish that Douglass had substantial ownership rights beyond possession before the payment of $10 for each lot. For example, Douglass could not sell a parcel to a third party before purchasing the parcel from Summerhill and closing that sale under the terms of the purchase and sale agreement. Douglass has not identified any language in the agreement that proves otherwise.

E.    Attributes of Ownership

Douglass argues that regardless of title, application of the attributes of ownership listed in WAC 458-20-170(2)(a) establishes that it was the owner of the property during construction.

15

No. 57108-1-II

Douglass argues that the attributes of ownership are applicable here because, unlike in *Nord*, Summerhill held a mere security interest in the property under the purchase and sale agreement. The Department, in turn, argues that there is no evidentiary support for Summerhill holding a security interest, and therefore under *Nord*, the attributes do not apply. We agree with the Department.

The *Nord* court held that WAC 458-20-170(2)(a)'s attributes of ownership were inapplicable in that case because there was "undisputed evidence of who owned the real property – the LLCs." 164 Wn. App. at 226. Division One held that the attributes are relevant only "when necessary to distinguish actual ownership from a mortgage or similar security interest." *Id*. at 228. In that case, the "LLC members held no mortgage or other security agreement with respect to the properties." *Id*. at 233.

We follow *Nord*'s reasoning, and therefore, we do not need to analyze the factors here. Douglass and Summerhill entered into a purchase and sale agreement that does not establish Summerhill had a mere security interest in the land. It is undisputed that Summerhill held legal title while Douglass performed construction on the property.

Douglass is correct that this case is different from *Nord* in a few ways. Nord entered into construction contracts with both Stanwood Condominiums LLC and Bellingham Condominiums LLC. *Id.* at 221. In exchange for a partial ownership interest in each LLC, Nord performed construction on the Stanwood and Bellingham properties. *Id*. at 220-21. Unlike the arrangement between Summerhill and Douglass, the LLCs in *Nord* also "paid Nord for its construction services, and sold the condominium units to the eventual purchasers." *Id*. at 233. Nord even admitted to not owning the property. *Id*. at 226. Here, Douglass was the sole member of Summerhill, paid for and

16

performed the construction, and maintains that it had an ownership interest in the property even though it had quitclaimed the property to Summerhill.

Nevertheless, these distinctions are immaterial to the *Nord* court's conclusion that the paramount requirement is that the builder be a bona fide owner of the property. *Id.* at 228; *see also Id.* at 228 n.6. The attributes are "relevant considerations *only* when necessary to distinguish actual ownership from a mortgage or similar security interest." *Nord*, 164 Wn. App. at 228 (emphasis added). The attributes do not relieve the builder of the fundamental requirement that it be the bona fide owner of the property before it can be a speculative builder. *Id.*

In response to *Nord,* Douglass asserts that this is a seller-financed sale where Summerhill functions as both the seller and lender, and Summerhill retained during construction a mere security interest to ensure Douglass would pay the $10 purchase price for each lot. However, there is no evidence that the parties intended Summerhill to hold merely a security interest.

The deed transferring ownership of the property from Douglass to Summerhill was a quitclaim deed. The purchase and sale agreement anticipating the transfer of the property from Summerhill back to Douglass does not include language about a financing agreement or security interest. Instead, the purchase and sale agreement is consistent with an earnest money agreement, expressly using the words "purchase and sale agreement" in the title and using "earnest money" in first paragraph of the agreement. CP at 41. The purchase and sale agreement shows that the only payment obligation Douglass had to Summerhill was upon closing, which Douglass could choose to do at any point in the future. Douglass chose to close on the transaction 10 to 13 years after signing the agreement.

At paragraph 8, the purchase and sale agreement states that if there is seller financing, the parties will execute a note, deed of trust form, or real estate contract form on or before closing. CP

No. 57108-1-II

at 42. While the record shows that Summerhill conveyed a security interest in the property to U.S. Bank, there are no such documents showing seller financing between Douglass and Summerhill. In our record, there is no loan document, deed of trust, promissory note, or any other document that grants, records, or releases a security interest between Douglass and Summerhill. The purchase and sale agreement also includes an integration clause at paragraph 20(d), stating that it "constitutes the full understanding" between the buyer and seller. CP at 43. Because Douglass did not hold title to the property and the purchase and sale agreement did not reflect that Summerhill had a mere security interest, the attributes do not apply.

Accordingly, we affirm the superior court's grant of summary judgment to the Department, concluding that Douglass was not the owner of the property during construction and, therefore, it was not a speculative builder as a matter of law.

CONCLUSION

We affirm the trial court's grant of summary judgment to the Department.


Glasgow, C.J.

We concur:

Lee, J.

Price, J.

18